# GERMAN ALLIANCE INSURANCE COMPANY *v.* LEWIS, SUPERINTENDENT. OF INSURANCE OF THE STATE OF KANSAS.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

No. 120. Argued December 10, 1913.—Decided April 20, 1914.

The business of insurance is so far affected with a public interest as to justify legislative regulation of its rates.

A public interest can exist in a business, such as insurance, distinct from a public use of property, and can be the basis of the power of the legislature to regulate the personal contracts involved in such business.

Where a business, such as insurance, is affected by a public use, it is the business that is the fundamental thing; property is but the instrument of such business.

*Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *Brass* v. *North Dakota*, 153 U. S. 391, demonstrate that a business by circumstances and its nature may rise from private to public concern and consequently become subject to governmental regulation; and the business of insurance falls within this principle.

The fact that a contract for insurance is one for indemnity and is personal, does not preclude regulation.

A general conception of the law-making bodies of the country that a business requires governmental regulation is not accidental and cannot exist without cause.

What makes for the general welfare is matter of legislative judgment, and judicial review is limited to power and excludes policy.

The liberty of contract guaranteed by the Fourteenth Amendment is not more intimately involved in price regulation than in other proper forms of regulation of business and property affected by a public use, and so *held* as to the regulation of rates of fire insurance.

The inactivity of a governmental power, no matter how prolonged, does not militate against its legality when exercised. *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366.

Whether rate regulation is necessary in regard to a particular business affected by a public use, such as insurance, is matter for legislative

judgment. This court can only determine whether the legislature has the power to enact it.

A discrimination is not invalid under the equal protection provision of the Fourteenth Amendment if not so arbitrary as to be beyond the wide discretion that a legislature may exercise; and so *held* as to a classification exempting farmers' mutual insurance companies doing only a farm business from the operation of an act regulating rates of insurance.

A legislative classification may rest on narrow distinctions. Legislation is addressed to evils as they appear and even degrees of evil may determine its exercise. *Ozan Lumber Co.* v. *Union National Bank*, 207 U. S. 251.

The Kansas statute of 1909, so far as it provides for regulating rates of fire insurance, is not unconstitutional under the Fourteenth Amendment as depriving insurance companies of their property without due process of law, as abridging the liberty of contract or as denying companies charging regular premiums the equal protection of the law by excepting farmers' mutual insurance companies from its operation.

BILL in equity to restrain the enforcement of the provisions of an act of the State of Kansas entitled "An act relating to Fire Insurance, and to provide for the Regulation and Control of rates of Premium Thereon, and to Prevent Discriminations Therein." Chap. 152 of the Session Laws of 1909.

The grounds of the bill are that the act offends the Constitution of the State and of the United States.

A summary of the requirements of the act is as follows:

Sec. 1. Every fire insurance company shall file with the superintendent of insurance general basis schedules showing the rates on all risks insurable by such company in the State and all the conditions which affect the rates or the value of the insurance to the assured.

Sec. 2. No change shall be made in the schedules except after ten days' notice to the superintendent, which notice shall state the changes proposed and the time when they

shall go into effect.  The superintendent may allow changes upon less notice.

Sec. 3.  When the superintendent shall determine any rate is excessive or unreasonably high or not adequate to the safety or soundness of the company, he is authorized to direct the company to publish and file a higher or a lower rate, which shall be commensurate with the character of the risk; but in every case the rate shall be reasonable.

Sec. 4.  No company shall engage or participate in insurance on property located in the State until the schedules of rates be filed nor write insurance at a different rate than the rate named in the schedules, or refund or remit in any manner or by any device any portion of the rates; or extend to any insured or other person any privileges, inducements or concessions except as specified in the schedules.

Sec. 5.  Any company making insurance where no rate has been filed shall, within thirty days after entering into such contract, file with the superintendent a schedule of such property showing the rate and such information as he may require.  The schedule shall conform to the general basis of schedules and shall constitute the permanent rate of the company.

Sec. 6.  The schedules shall be open to the inspection of the public, and each local agent shall have and exhibit to the public copies thereof relative to all risks upon which he is authorized to write insurance.

Sec. 7.  No company shall directly or indirectly, by any special rate or by any device, charge or receive from any person a different rate of compensation for insurance than it charges or receives from any other person for like insurance or risks of a like kind and hazard under similar circumstances and conditions in the State.  Any company violating this provision shall be deemed guilty of unjust discrimination, which is declared unlawful.

Sec. 8.  The superintendent may, if he finds that any

company, or any officer, agent or representative thereof, has violated any of the provisions of the act, revoke the license of such offending company, officer, or agent, but such revocation shall not affect liability for the violation of any other section of the act; and provided that any action, decision or determination of the superintendent under the provisions of the act shall be subject to review by the courts of the State as provided in the act.

Sec. 9. The superintendent shall give notice of any order or regulation made by him under the act, and any company, or any person, city or municipality which shall be interested, shall have the right within thirty days to bring an action against the superintendent in any district court of the State to have the order or regulation vacated. Issues shall be formed and the controversy tried and determined as in other cases of a civil nature, and the court may set aside one or more or any part of any of the regulations or orders which the court shall find to be unreasonable, unjust, excessive or inadequate to compensate the company writing insurance thereon for the risk assumed by it, without disturbing others. The order of the superintendent shall not be suspended or enjoined, but the court may permit the complaining company to write insurance at the rates which obtained prior to such order upon the condition that the difference in the rates shall be deposited with the superintendent to be paid to the company or to the holders of policies as, on final determination of the suit, the court may deem just and reasonable. During the pendency of the suit no penalties or forfeitures shall attach or accrue on account of the failure of the complainant to comply with the order sought to be vacated or modified until the final determination of the suit. Proceedings in error may be instituted in the Supreme Court of the State as in other civil cases, and that court shall examine the record, including the evidence, and render such judgment as shall be just and equitable. No action

shall be brought in the United States courts until the remedies provided by the act shall have been exhausted. If any company organized under the laws of the State or authorized to transact business in the State shall violate the section, the superintendent may cancel the authority of the company to transact business in the State.

Sec. 10. Infractions of the act are declared to be misdemeanors and punishable by a fine not exceeding $100 for each offense, provided that if the conviction be for an unlawful discrimination the punishment may be by a fine or by imprisonment in the county jail not exceeding ninety days, or by both fine and imprisonment.

Sec. 11. No person shall be excused from testifying at the trial of any other person on the ground that the testimony may incriminate him, but he shall not be prosecuted on account of any transaction about which he may testify, except for perjury committed in so testifying; "provided, that nothing in this act shall affect farmers' mutual insurance companies organized and doing business under the laws of this State and insuring only farm property."

The bill alleged that it was brought by the German Alliance Insurance Company in behalf of itself and all other companies and corporations conducting a similar business and similarly situated, and that Charles W. Barnes was the duly elected superintendent of fire insurance of the State of Kansas. It alleged the jurisdictional amount, and that the controversy was one arising under the Constitution of the United States and of the State of Kansas. It alleged, further, the following facts, which we state in narrative form, omitting those which relate to the constitution of the State, no assignment of error being based upon them: The appellant, to which we shall refer as complainant, was incorporated under the laws of New York as a fire insurance company in 1879 and immediately entered upon such business, and it has for long periods of

time conducted the business of fire insurance in Kansas and other States of the United States.

The business of fire insurance as conducted by it consists of making indemnity contracts against direct loss or damage by fire for a consideration paid, known as a premium; that the rate or premium is the amount charged for each $100 of indemnity. The property which is the subject of insurance is ordinarily known and designated as the risk. Complainant issues indemnity contracts or fire insurance policies covering all kinds and descriptions of improvements upon real estate and the contents thereof and all kinds and descriptions of personal property and also farm houses, barns and granaries and their contents. The rate of premium varies with the kind of property covered, its physical characteristics and situation, its exposure, the presence or absence of fire protection, and many other causes.

The establishment of the basis rate for the premium to be charged is a matter of technical and mathematical deduction from the experience of all fire insurance companies covering a long period of years and, territorially, the whole civilized world. To make such deduction it is necessary not only to be in possession of the compiled statistics of fire insurance business, but also to be skilled in the mathematical 'theory of probabilities' and in the 'law of large numbers' so as to be able to apply with technical accuracy such laws and such data, and that no one not specially trained as an insurance statistician is competent to make such deductions.

A theoretically correct basis rate having thus been arrived at is subject to variation according to the risk, whether in town or country, and, if in the former, according to the class of town or city in which it is situated. The classification of towns and cities depends upon water supply, fire protection and general physical conditions. In addition to ascertaining the individual risk, if a build-

ing, the size, material of which and the manner in which it is constructed, the character of the occupancy, and the character of the occupancy and construction of adjacent buildings, also the character of the contents of the buildings and the manner in which they are stored and the precautions used to detect and prevent fires, are necessary to be ascertained.

Complainant and others engaged in the insurance business employ a large number of men skilled as inspectors to report upon individual risks, and it is impossible to fix and adjust a reasonable rate of premium for each and every individual risk without the information so obtained and having the same applied by experts. And such training and information are necessary to determine whether a basic rate or actual rate as applied to any particular risk is or is not reasonable, and the respondent is not possessed of the requisite information or special training necessary to qualify for such determination and any conclusion to which he might come would be a mere guess or arbitrary determination; and the provisions of the act can only be properly administered in any event by the employment by the State of a corps of inspectors and experts specially trained in the business of fixing rates of fire insurance.

The complainant has complied with all of the laws of the State and has received the regular license or authorization of the State, to transact the business of fire insurance therein.

It conducts its business by means of resident agents, of which it has seventy-two directly employed; it has a large and valuable established business to secure which it has expended a large sum of money, and to be compelled to give up its business would result in irreparable damage and injury to it. A large number of the fire insurance policies issued by complainant are written upon farm buildings and their contents and in writing such business

it comes into direct, competition with various farmers' mutual insurance companies organized and doing business under the laws of the State and insuring only farm property.

The business of fire insurance is purely and exclusively a private business and may be transacted by private persons in their individual capacity or by unincorporated or incorporated companies, that the amount of indemnity and the premium is a matter or private negotiation and agreement, and the act of the legislature of the State of Kansas attempts to regulate the business in so far as the fixing of the rate of premium is concerned and in the attempted regulation distinguishes between fire insurance companies and individuals and partnerships, and thereby denies to complainant and other companies the equal protection of the law, contrary to the Fourteenth Amendment to the Constitution of the United States, and is therefore unconstitutional and void.

Under the laws of Kansas, mutual fire insurance companies may be organized, that such companies having a guaranteed fund of $25,000 may do business on a cash basis and accept premiums in cash and that such premium measures the total liability of the insured under the policy either to the company or to its creditors; that by the eleventh section of the act under review, it is provided 'that nothing in this act shall affect farmers' mutual insurance companies, organized and doing business under the laws of this State, and insuring only farm property.' The complainant and many other companies insure farm property and come into direct competition with farmers' mutual companies of the character specified and the act of the legislature in excepting the latter companies deprives complainant of the equal protection of the laws and is therefore repugnant to the Fourteenth Amendment of the Constitution of the United States and is unconstitutional and void.

The business of fire insurance is private, with which the State has no right to interfere, and the right to fix by private contract the rate of premium is a property right of value; the business is not a monopoly either legally or actually, it may not be legally conducted by the National Government or by the State of Kansas or other States under their respective constitutions, and is not a business included within the functions of government. Neither complainant nor others engaged in fire insurance receive or enjoy from the State of Kansas, or any government, state or national, any privilege or immunity not in like manner and to like extent received and enjoyed by all other persons, partnerships and companies, incorporated or unincorporated, respectively, engaged in the conduct of other lines of private business and enterprises. Complainant, therefore, is deprived of one of the incidents of liberty and of its property without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States.

The act distinguishes between fire insurance companies and other insurance companies, individuals and persons and distinguishes between insurance and other lines of business and thereby offends the equality clause of the Constitution of the United States.

Complainant, under protest, filed the general basis schedules of its rates as required by the act, which were arrived at by the process hereinbefore set out. On the nineteenth of August, 1909, respondent made a reduction of 12% from the rates as filed and from the rates filed by other companies, with the proviso that it should not apply to residence property, churches, school houses, farm property or special hazards. The order was to become effective September 1, 1909. And it was further ordered that on and after that date the exception of churches and dwelling houses should be eliminated. Complainant notified the superintendent by letter that it would, under

protest, and reserving the rights which it had under the law, comply with the provisions of the order.

The risks included in the order and not excepted therefrom, comprise all ordinary mercantile risks in the State and that the reduction of 12% will result in a rate which is much less than the cost of carrying the risks.

Respondent is threatening to make further reductions and it is proposed to revoke the license of any fire insurance company which may violate the provisions of the act, even though the rates fixed by him may be so low as to be confiscatory and to inflict upon the officers of the company, including complainant, the penalties prescribed for such violation, and such companies and complainant, unless defendant be restrained by injunction, will be obliged to comply with the requirements of the act to their irreparable damage and injury.

Complainant finally alleges that it is not its purpose to attack the orders of respondent on the ground that they were not made in strict compliance with the provisions of the act, but to have the act in its entirety declared to be unconstitutional and void for the reasons alleged, and to have respondent restrained and orders made by him under the provisions of the act enjoined. And such an injunction is prayed.

Respondent filed a demurrer stating that he demurred to so much of the bill as charges the act of the State of Kansas to be repugnant to the constitution of Kansas and the Constitution of the United States. The demurrer was sustained. Subsequently, upon the bill being amended, a general demurrer was filed, which was also sustained by the court, and the bill dismissed. Prior, however, to this action, it having been suggested that the term of office of Charles W. Barnes as superintendent of insurance had expired and that Ike Lewis had succeeded to that office and to all of its duties and powers, he was made defendant in the place and stead of Charles W. Barnes.

*Mr. Thomas Bates* and *Mr. John G. Johnson,* with whom *Mr. Seymour Edgerton* was on the brief, for appellant:

The business of fire insurance is a private business and the public has no legal right to demand its service. *Am. Surety Co.* v. *Shallenberger,* 183 Fed. Rep. 636; *Hunt* v. *Simmons,* 19 Missouri, 583; *Orr* v. *Home Ins. Co.,* 12 La. Ann. 255; *Queen Ins. Co.* v. *State,* 86 Texas, 250.

The State has not the power to fix the rates charged to the public either by corporations or individuals engaged in a private business, and the test as to whether a use is public or not is whether a public trust is imposed upon the property, and whether the public has a legal right to the use which cannot be denied. *Allen* v. *Jay,* 60 Maine, 124; *Am. L. S. C. Co.* v. *Chi. Live Stock Exch.,* 143 Illinois, 210; *Arnsperger* v. *Crawford,* 101 Maryland, 247; *Avery* v. *Vermont El. Co.,* 75 Vermont, 235; *Brown* v. *Gerald,* 100 Maine, 351; *Burlington* v. *Beasley,* 94 U. S. 310; *Ches. & Pot. Tel. Co.* v. *Manning,* 186 U. S. 238; *Citizens Savings Assn.* v. *Topeka,* 20 Wall. 655; *Collister* v. *Hayman,* 183 N. Y. 250; *Dutton* v. *Strong,* 1 Black, 1; *Ex parte Quarg,* 149 California, 79; *Fallsberg Co.* v. *Alexander,* 101 Virginia, 98; *Farmers' Market Co.* v. *P. & R. T. Ry. Co.,* 142 Pa. St. 580; *Gaylord* v. *Sanitary Dist.,* 204 Illinois, 576; *Howard Mills* v. *Schwartz Lumber Co.,* 77 Kansas, 599; *Horney* v. *Nixon,* 213 Pa. St. 20; *Hurley* v. *Eddingfield,* 156 Indiana, 416; *Jacobs* v. *Water Sup. Co.,* 220 Pa. St. 388; *L. & N. R. Co.* v. *West Coast Co.,* 198 U. S. 483; *Ladd* v. *Southern Cotton Co.,* 53 Texas, 172; *Pearce* v. *Spalding,* 12 Mo. App. 141; *People* v. *Steel,* 231 Illinois, 340; *Purcell* v. *Daly,* 19 Abb. N. C. 301; *Queen Ins. Co.* v. *State,* 86 Texas, 250; *Ryan* v. *Terminal Co.,* 102 Tennessee, 111; *Shasta Power Co.* v. *Walker,* 149 Fed. Rep. 568; *Sholl* v. *German C. Co.,* 118 Illinois, 427; *Stock Exchange* v. *Board of Trade,* 127 Illinois, 153; *State* v. *Associated Press,* 159 Missouri, 410; *Tyler* v. *Beacher,* 44 Vermont, 648; *Ulmer* v. *Ry. Co.,* 98

Maine, 579; *Weems Steamboat Co.* v. *People's Steamboat Co.*, 214 U. S. 345.

The regulation of rates and charges in a private business is not within the police power of the State. *Adair* v. *United States*, 208 U. S. 175; *Coffeyville Co.* v. *Perry*, 69 Kansas, 297; *Connolly* v. *Union Pipe Co.*, 184 U. S. 540; *Dobbins* v. *Los Angeles*, 195 U. S. 223; *Ex parte Dicky*, 144 California, 234; *Holden* v. *Hardy*, 169 U. S. 366; *Hurtado* v. *California*, 110 U. S. 535; *In re Berger*, 195 Missouri, 16; *Kreibohm* v. *Yansey*, 154 Missouri, 67; *Lawton* v. *Steel*, 152 U. S. 133; *Lochner* v. *New York*, 198 U. S. 45; *Mugler* v. *Kansas*, 123 U. S. 623; *Muller* v. *Oregon*, 208 U. S. 412; *Munn* v. *Illinois*, 94 U. S. 113; *People* v. *Steele*, 231 Illinois, 340; *People* v. *Coler*, 166 N. Y. 1; *State* v. *Associated Press*, 159 Missouri, 410; *Street* v. *Varney El. Sup. Co.*, 160 Indiana, 338; *West Branch Ex.* v. *McCormick*, 1 Pa. Dist. Rep. 542.

The Kansas rate law of 1909 cannot be sustained as a condition precedent to the right of a foreign corporation to do business in the State. *Ætna Ins. Co.* v. *Jones*, 78 So. Car. 445; *American Co.* v. *Shallenberger*, 183 Fed. Rep. 636; *Cargill* v. *Minnesota*, 180 U. S. 452; *Carroll* v. *Greenwich Ins. Co.*, 199 U. S. 401; *Connolly* v. *Union Pipe Co.*, 184 U. S. 540; *Ins. Co.* v. *Prewitt*, 202 U. S. 246; *Lafayette Ins. Co.* v. *French*, 18 How. 404; *Nat. Council* v. *State Council*, 203 U. S. 151; *Orient Ins. Co.* v. *Daggs*, 172 U. S. 557; *So. Pac. Co.* v. *Denton*, 146 U. S. 202; *Waters-Pierce Oil Co.* v. *Texas*, 177 U. S. 28; *West. Un. Tel. Co.* v. *Kansas*, 216 U. S. 1.

The law cannot be sustained on the ground that it is within the power of the legislature of a State to impose such conditions as it likes upon corporations which derive their right to exist from the State. *Lake Shore &c. R. Co.* v. *Smith*, 173 U. S. 684; *People* v. *Budd*, 117 N. Y. 1; *State* v. *Associated Press*, 159 Missouri, 410.

The business of fire insurance is not a monopoly.

*Herriman* v. *Menzies*, 115 California, 16; *United States* v. *American Tobacco Co.*, 164 Fed. Rep. 700.

The business of fire insurance is not a proper function of government, nor does it receive special privileges from the State. *Ætna Life Ins. Co.* v. *Coulter*, 115 Kentucky, 787; *Ohio* v. *Guilbert*, 56 Oh. St. 575; *Opinion of the Justices*, 155 Massachusetts, 598; *Id.* 182 Massachusetts, 605; § 4091, Gen. Stat. Kansas, 1909.

A general public interest is not equivalent to a public use. *Lowell* v. *Boston*, 111 Massachusetts, 454; *Matter of Mayor of New York*, 135 N. Y. 253; *Matter of Niagara Falls Co.*, 108 N. Y. 375.

The power to regulate rates and charges is simply the power to take private property for public use. *Charles River Bridge Case*, 11 Peters, 420; *Cole* v. *La Grange*, 113 U. S. 1; *Dodge* v. *Michigan Twp.*, 107 Fed. Rep. 827; 2 Kent's Comm. 333; *Lowell* v. *Boston*, 111 Massachusetts, 454; *Opinion of the Justices*, 155 Massachusetts, 598. See also, as bearing on this subject: *Allnutt* v. *Inglis*, 12 East, 527; *Brass* v. *North Dakota*, 153 U. S. 391; *Budd* v. *New York*, 143 U. S. 517, *S. C.*, 117 N. Y. 1; *State* v. *Edwards*, 86 Maine, 102; *Munn* v. *Illinois*, 94 U. S. 113; *Spring Valley Co.* v. *Schottler*, 110 U. S. 347; *Burlington* v. *Beasley*, 94 U. S. 310; *Dow* v. *Beidelman*, 125 U. S. 680; *Wabash &c. Ry. Co.* v. *Illinois*, 118 U. S. 557; *German Alliance Ins. Co.* v. *Hale*, 219 U. S. 307; *Noble State Bank* v. *Haskell*, 219 U. S. 104 and 575; *Dodge* v. *Mission Township*, 107 Fed. Rep. 827; *Paul* v. *Virginia*, 8 Wall. 168.

Mr. *John S. Dawson*, Attorney General of the State of Kansas, with whom Mr. *S. N. Hawks*, Mr. *F. S. Jackson* and Mr. *C. B. Smith* were on the brief, for appellee:

The act complained of is within the police power of the State. *Noble State Bank* v. *Haskell*, 219 U. S. 112 and 575; *German Alliance Ins. Co.* v. *Hale*, 219 U. S. 307; *Carroll* v. *Greenwich Ins. Co.*, 199 U. S. 401, 411; *Jacobson* v. *Mas-*

*sachusetts,* 197 U. S. 11, 27, 31; *Lake Shore &c. R. R.* v. *Ohio,* 173 U. S. 285, 297; *Citizens Ins. Co.* v. *Clay,* 197 Fed. Rep. 435; *German Alliance Ins. Co.* v. *Barnes,* 189 Fed. Rep. 769.

The act is not repugnant to § 1 of the Fourteenth Amendment, as the State has full power of classification. *Hays* v. *Missouri,* 120 U. S. 68; *Railroad Co.* v. *Mackey,* 127 U. S. 205; *Walston* v. *Nevin,* 128 U. S. 578; *Bell's Gap R. R.* v. *Pennsylvania,* 134 U. S. 232; *Pacific Exp. Co.* v. *Seibert,* 142 U. S. 339; *Giozza* v. *Tiernan,* 148 U. S. 657; *Columbia Southern Ry.* v. *Wright,* 151 U. S. 470; *Marchant* v. *Penna. R. R.,* 153 U. S. 380; *St. Louis & S. F. Ry.* v. *Mathews,* 165 U. S. 1; *Railroad Co.* v. *Matthews,* 174 U. S. 99; *Barbier* v. *Connolly,* 113 U. S. 27; *St. Louis &c. Ry. Co.* v. *Paul,* 173 U. S. 404.

The act is not repugnant to either the due process clause of the Fourteenth Amendment or to the equal protection clause. *Magoun* v. *Illinois Trust Co.,* 170 U. S. 283; *Railway Co.* v. *Mackey,* 127 U. S. 204, 208; *Minn. & St. L. Ry.* v. *Beckwith,* 129 U. S. 26; *Davidson* v. *New Orleans,* 96 U. S. 97; *Holden* v. *Hardy,* 169 U. S. 366, 389; *Hooper* v. *California,* 155 U. S. 648; *Paul* v. *Virginia,* 8 Wall. 168, 179; *Ducat* v. *Chicago,* 10 Wall. 410, 415; *Liverpool Ins. Co.* v. *Massachusetts,* 10 Wall. 566, 573; *Orient Ins. Co.* v. *Daggs,* 172 U. S. 561; *Blake* v. *McClung,* 172 U. S. 239; *Santa Clara County* v. *Southern Pac.,* 118 U. S. 394; *Smyth* v. *Ames,* 169 U. S. 466; *Crutcher* v. *Kentucky,* 141 U. S. 47; *Bank of Augusta* v. *Earle,* 13 Pet. 519; *Paul* v. *Virginia,* 8 Wall. 168; *Cooper Mfg. Co.* v. *Ferguson,* 113 U. S. 727; *Phila. Fire Assn.* v. *New York,* 119 U. S. 110; *Fritts* v. *Palmer,* 132 U. S. 282; *Mo. Pac. Ry. Co.* v. *Mackey,* 127 U. S. 209; *Barbier* v. *Connolly,* 113 U. S. 32; *Soon Hing* v. *Crowley,* 113 U. S. 703; *Railway Tax Cases,* 115 U. S. 322; *Home Ins. Co.* v. *New York,* 134 U. S. 606; *Pac. Exp. Co.* v. *Seibert,* 142 U. S. 339; *New York &c.* v. *Bristow,* 151 U. S. 571.

The validity of the act can be sustained under the police power of the State, as well as under the power of the State to regulate corporations created by it, or permitted by it to do business within its borders. *Assurance Co.* v. *Bradford,* 60 Kansas, 85; *Railroad Co.* v. *Matthews,* 58 Kansas, 447; *Gulf R. R. Co.* v. *Ellis,* 165 U. S. 155; *Atkinson* v. *Woodmansee,* 68 Kansas, 74; *Fidelity Life Assn.* v. *Mettler,* 185 U. S. 322; *Railroad Co.* v. *Matthews,* 174 U. S. 96; *Orient Ins. Co.* v. *Daggs,* 172 U. S. 557; *Waters-Pierce Oil Co.* v. *Texas,* 177 U. S. 28; *N. Y. Life Ins. Co.* v. *Cravens,* 178 U. S. 384; *Insurance Co.* v. *Warren,* 181 U. S. 73; *Commonwealth* v. *Vrooman,* 164 Pa. St. 306; *Doyle* v. *Insurance Co.,* 94 U. S. 535; *State* v. *Mo. Pac. Ry. Co.,* 33 Kansas, 176; *Leavenworth* v. *Water Co.,* 62 Kansas, 643; *Inhabitants of Wayland* v. *Middlesex County,* 4 Gray (Mass.), 500; *Irrigation Co.* v. *Klein,* 63 Kansas, 484; *West* v. *Bank,* 66 Kansas, 524.

The classifications made by the legislature are proper. 4 Supreme Court Encyc. 357; *Heath & Milligan* v. *Worst,* 207 U. S. 354; *Ozan Lumber Co.* v. *Union Natl. Bank,* 207 U. S. 256; *Mobile Co.* v. *Kimball,* 102 U. S. 691; *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 U. S. 150; *Missouri, K. & T. R. Co.* v. *May,* 194 U. S. 267.

Insurance is affected by public interest. *State* v. *Insurance Co.,* 30 Kansas, 585; *State* v. *Phipps,* 50 Kansas, 609; *Blaker* v. *Hood,* 53 Kansas, 499, 509; *State* v. *Phipps,* 50 Kansas, 619; Freund on Police Power, §§ 400–401; *Ætna Life Ins. Co.* v. *Hardison,* 199 Massachusetts, 181; *N. Y. Life Ins. Co.* v. *Hardison,* 199 Massachusetts, 190; 3 Selected Essays in Anglo-Am. Legal History, p. 108; Zartman's Yale Readings in Ins. pp. 9–10, and 213; Arnold on Marine Ins. 102; *Munn* v. *Illinois,* 94 U. S. 113; 7 Encyc. U. S. Sup. Ct. Rep. 78; 4 Encyc. U. S. Sup. Ct. Rep. 77; *Northwestern Ins. Co.* v. *Riggs,* 203 U. S. 243; *Phœnix Ins. Co.* v. *Montgomery,* 42 L. R. A. 468; *Exempt Firemen* v. *Roone,* 93 N. Y. 313; *Firemen's Assn.* v. *Louisburg,* 21

Illinois, 511; *Milwaukee* v. *Helfenstein*, 16 Wisconsin, 142.

As to the right to fix rates, see *Winchester Turnpike Co.* v. *Croxton*, 33 L. R. A. 177; *Munn* v. *Illinois*, 94 U. S. 113; *Georgia R. R. Co.* v. *Smith*, 128 U. S. 174; *Allnutt* v. *Lord Hale* (De Portibus Maris, 1 Hargraves Law Tracts, 78); *Mobile* v. *Yuille*, 3 Alabama, 137; *Laurel Fork R. R. Co.* v. *West Virginia Trans. Co.*, 25 W. Va. 324; *Allnutt* v. *Inglis*, 12 East, 527; *People* v. *Budd*, 117 N. Y. 1, S. C., 143 U. S. 517; *Re Annon*, 50 Hun, 415, aff'd 26 N. Y. S. R. 554; *Spring Valley Co.* v. *Schottle*, 110 U. S. 347; *Brass* v. *Stoeser*, 153 U. S. 391, aff'g, 2 Nor. Dak. 482.

As to public interest and public use, see *Budd* v. *New York*, 143 U. S. 517; Freund's Police Power, §§ 304, 378; *People* v. *Formosa*, 61 Hun, 272; *Boxwell* v. *Security Life Ins. Co.*, 193 N. Y. 465; *Lumbermen's Exchange* v. *Fisher*, 150 Pa. St. 475; *Craig* v. *Kline*, 65 Pa. St. 399; *Henry* v. *Roberts*, 50 Fed. Rep. 902; *Genesee Fork Co.* v. *Ives*, 144 Pa. St. 114; *Mobile* v. *Yuille*, 3 Alabama, 137; *Brass* v. *Stoeser*, 153 U. S. 391; *McCarty* v. *Firemen's Ins. Co.*, 73 Atl. Rep. 80; *Civil Rights Cases*, 109 U. S. 62.

As to illegality of fire underwriters associations, see *N. Y. Bd. of Underwriters* v. *Higgins*, 114 N. Y. Supp. 506; *Firemen's Fund Ins. Co.* v. *Helner*, 49 So. Rep. 297; *Continental Co.* v. *Parks*, 142 Alabama, 650, 39 So. Rep. 204; *Orient Ins. Co.* v. *Daggs*, 172 U. S. 565; *Farmers' Ins. Co.* v. *Dobney*, 189 U. S. 301; *Barbier* v. *Connelly*, 113 U. S. 27, 28.

After stating the case as above, MR. JUSTICE MC-KENNA delivered the opinion of the court.

The specific error complained of is the refusal of the District Court to hold that the act of the State of Kansas is unconstitutional and void as offending the due process clause of the Fourteenth Amendment of the Constitution of the United States. To support this charge of error,

complainant asserts that the business of fire insurance is a private business and, therefore, there is no constitutional power in a State to fix the rates and charges for services rendered by it. An exercise of such right, it is contended, is a taking of private property for a public use. The contention is made in various ways and, excluding possible countervailing contentions, it is urged that the act under review cannot be justified as an exercise of the police power or of the power of the State to admit foreign corporations within its borders upon such terms as it may prescribe, or of any other power possessed by the State; that no State has the power to impose unconstitutional burdens either upon private citizens or private corporations engaged in a private business.

The basic contention is that the business of insurance is a natural right, receiving no privilege from the State, is voluntarily entered into, cannot be compelled nor can any of its exercises be compelled; that it concerns personal contracts of indemnity against certain contingencies merely. Whether such contracts shall be made at all, it is contended, is a matter of private negotiation and agreement, and necessarily there must be freedom in fixing their terms. And "where the right to demand and receive service does not exist in the public, the correlative right of regulation as to rates and charges does not exist." Many elements, it is urged, determine the extending or rejection of insurance; the hazards are relative and depend upon many circumstances upon which there may be different judgments, and there are personal considerations as well—"moral hazards," as they are called.

It is not clear to what extent some of these circumstances are urged as affecting the power of regulation in the State. It would seem to be urged that each risk is individual and no rule of rates can be formed or applied. The bill asserts the contrary. It in effect admits that there can be standards and classification of risks, determined by the

law of averages. Indeed, it is a matter of common knowledge that rates are fixed and accommodated to those standards and classification in pre-arranged schedules, and, granted the rates may be varied in particular instances, they are sufficiently definite and applicable as a general and practically constant rule. They are the product, it is true, of skill and experience, but such skill and experience a regulating body may have as well as the creating body. Indeed, an allegation in the original bill that the superintendent of insurance could not have the requisite technical and mathematical training to determine whether a basic rate or an actual rate as applied to any particular risk was or was not reasonable and that his conclusion, therefore, "would be a mere guess or arbitrary determination" was omitted by an amendment. It would indeed be a strained contention that the Government could not avail itself, in the exercise of power it might deem wise to exert, of the skill and knowledge possessed by the world. We may put aside, therefore, all merely adventitious considerations and come to the bare and essential one, whether a contract of fire insurance is private and as such has constitutional immunity from regulation. Or, to state it differently and to express an antithetical proposition, is the business of insurance so far affected with a public interest as to justify legislative regulation of its rates? And we mean a broad and definite public interest. In some degree the public interest is concerned in every transaction between men, the sum of the transactions constituting the activities of life. But there is something more special than this, something of more definite consequence, which makes the public interest that justifies regulatory legislation. We can best explain by examples. The transportation of property—business of common carriers—is obviously of public concern and its regulation is an accepted governmental power. The transmission of intelligence is of cognate character. There are other

utilities which are denominated public, such as the furnishing of water and light, including in the latter gas and electricity. We do not hesitate at their regulation nor at the fixing of the prices which may be charged for their service. The basis of the ready concession of the power of regulation is the public interest. This is not denied, but its application to insurance is so far denied as not to extend to the fixing of rates. It is said, the State has no power to fix the rates charged to the public by either corporations or individuals engaged in a private business, and the "test of whether the use is public or not is whether a public trust is imposed upon the property and whether the public has a legal right to the use which cannot be denied;" or, as we have said, quoting counsel, "Where the right to demand and receive service does not exist in the public, the correlative right of regulation as to rates and charges does not exist." Cases are cited which, it must be admitted, support the contention. The distinction is artificial. It is, indeed, but the assertion that the cited examples embrace all cases of public interest. The complainant explicitly so contends, urging that the test it applies excludes the idea that there can be a public interest which gives the power of regulation as distinct from a public use which, necessarily, it is contended, can only apply to property, not to personal contracts. The distinction, we think, has no basis in principle (*Noble State Bank* v. *Haskell*, 219 U. S. 104), nor has the other contention that the service which cannot be demanded cannot be regulated.

*Munn* v. *Illinois*, 94 U. S. 113, is an instructive example of legislative power exerted in the public interest. The constitution of Illinois declared all elevators or storehouses, where grain or other property was stored for a compensation, to be public warehouses, and a law was subsequently enacted fixing rates of storage. In other words, that which had been private property had from its

uses become, it was declared, of public concern and the compensation to be charged for its use prescribed. The law was sustained against the contention that it deprived the owners of the warehouses of their property without due process of law. We can only cite the case and state its principle, not review it at any length. The principle was expressed to be, quoting Lord Chief Justice Hale, "that when private property is 'affected with a public interest it ceases to be *juris privati*' only" and it becomes "clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large"; and, so using it, the owner "grants to the public an interest in that use, and must submit to be controlled by the public for the common good." And it was said that the application of the principle could not be denied because no precedent could be found for a statute precisely like the one reviewed. It presented a case, the court further said, "for the application of a long-known and well-established principle in social science, and this statute simply extends the law so as to meet this new development of commercial progress." The principle was expressed as to property, and the instance of its application was to property, but it is manifestly broader than that instance. It is the business that is the fundamental thing; property is but its instrument, the means of rendering the service which has become of public interest.

That the case had broader application than the use of property is manifest from the grounds expressed in the dissenting opinion. The basis of the opinion was that the business regulated was private and had "no special privilege connected with it, nor did the law ever extend to it any greater protection than it extended to all other private business." The argument encountered opposing examples, among others, the regulation of the rate of interest on money. The regulation was accounted for on the ground that the act of Parliament permitting the charging

of some interest was a relaxation of a prohibition of the common law against charging any interest, but this explanation overlooked the fact that both the common law and the act of Parliament were exercises of government regulation of a strictly private business in the interest of public policy, a policy which still endures and still dictates regulating laws. Against that conservatism of the mind, which puts to question every new act of regulating legislation and regards the legislation invalid or dangerous until it has become familiar, government—state and National—has pressed on in the general welfare; and our reports are full of cases where in instance after instance the exercise of regulation was resisted and yet sustained against attacks asserted to be justified by the Constitution of the United States. The dread of the moment having passed, no one is now heard to say that rights were restrained or their constitutional guaranties impaired.

*Munn* v. *Illinois* was approved in many state decisions, but it was brought to the review of this court in *Budd* v. *New York*, 143 U. S. 517, and its doctrine, after elaborate consideration, re-affirmed, and against the same arguments which are now urged against the Kansas statute. Nowhere have these arguments been, or could be, advanced with greater strength and felicity of expression than in the dissenting opinion of Mr. Justice Brewer. Every consideration was adduced, based on the private character of the business regulated and, for that reason, its constitutional immunity from regulation, with all the power of argument and illustration of which that great judge was a master. The considerations urged did not prevail. Against them the court opposed the ever-existing police power in government and its necessary exercise for the public good and declared its entire accommodation to the limitations of the Constitution. The court was not deterred by the charge (repeated in the case at bar) that its decision had the sweeping and dangerous comprehension of subjecting to

legislative regulation all of the businesses and affairs of life and the prices of all commodities. Whether we may apprehend such result by extending the principle of the cases to fire insurance we shall presently consider.

In *Brass* v. *Stoeser*, 153 U. S. 391, *Munn* v. *Illinois* and *Budd* v. *New York* were affirmed. A law of the State of North Dakota was sustained which made all buildings, elevators and warehouses used for the handling of grain for a profit public warehouses, and fixed a storage rate. The case is important. It extended the principle of the other two cases and denuded it of the limiting element which was supposed to beset it—that to justify regulation of a business the business must have a monopolistic character. That distinction was pressed and answered. It was argued, the court said (p. 402), "that the statutes of Illinois and New York [passed on in the *Munn* and *Budd Cases*] are intended to operate in great trade centers, where, on account of the business being localized in the hands of a few persons in close proximity to each other, great opportunities for combinations to raise and control elevating and storage charges are afforded, while the wide extent of the State of North Dakota and the small population of its country towns and villages are said to present no such opportunities." And it was also urged that the method of carrying on business in North Dakota and the Eastern cities was different, that the elevators in the latter were essentially means of transporting grain from the lakes to the railroads and those who owned them could, if uncontrolled by law, extort such charges as they pleased, and stress was laid upon the expression in the other cases which represented the business as a practical monopoly. A contrast was made between those conditions and those which existed in an agricultural State where land was cheap and limitless in quantity. It was replied that this difference in conditions was "for those who make, not for those who interpret, the laws." And con-

sidering the expressions in the other cases which, it was said, went rather to the expediency of the laws, than to their validity, yet, it was further said, the expressions had their value because the "obvious aim of the reasoning that prevailed was to show that the subject-matter of these enactments fell within the legitimate sphere of legislative power, and that, so far as the laws and Constitution of the United States were concerned, the legislation in question deprived no person of his property without due process of law" (p. 404).

The cases need no explanatory or fortifying comment. They demonstrate that a business, by circumstances and its nature, may rise from private to be of public concern and be subject, in consequence, to governmental regulation. And they demonstrate, to apply the language of Judge Andrews in *People* v. *Budd* (117 N. Y. 1, 27), that the attempts made to place the right of public regulation in the cases in which it has been exerted, and of which we have given examples, upon the ground of special privilege conferred by the public on those affected cannot be supported. "The underlying principle is that business of certain kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation." Is the business of insurance within the principle? It would be a bold thing to say that the principle is fixed, inelastic, in the precedents of the past and cannot be applied though modern economic conditions may make necessary or beneficial its application. In other words, to say that government possessed at one time a greater power to recognize the public interest in a business and its regulation to promote the general welfare than government possesses to-day. We proceed then to consider whether the business of insurance is within the principle.

A contract for fire insurance is one for indemnity against loss and is personal. The admission, however, does not

take us far in the solution of the question presented. Its personal character certainly does not of itself preclude regulation, for there are many examples of governmental regulation of personal contracts, and in the statutes of every State in the Union superintendence and control over the business of insurance are exercised, varying in details and extent. We need not particularize in detail. We need only say that there was quite early (in Massachusetts 1837, New York 1853) state provision for what is known as the unearned premium fund or reserve; then came the limitation of dividends, the publishing of accounts, valued policies, standards of policies, prescribing investment, requiring deposits in money or bonds, confining the business to corporations, preventing discrimination in rates, limitation of risks and other regulations equally restrictive. In other words, the State has stepped in and imposed conditions upon the companies, restraining the absolute liberty which businesses strictly private are permitted to exercise.

Those regulations exhibit it to be the conception of the law-making bodies of the country without exception that the business of insurance so far affects the public welfare as to invoke and require governmental regulation. A conception so general cannot be without cause. The universal sense of a people cannot be accidental; its persistence saves it from the charge of unconsidered impulse, and its estimate of insurance certainly has substantial basis. Accidental fires are inevitable and the extent of loss very great. The effect of insurance—indeed, it has been said to be its fundamental object—is to distribute the loss over as wide an area as possible. In other words, the loss is spread over the country, the disaster to an individual is shared by many, the disaster to a community shared by other communities; great catastrophes are thereby lessened, and, it may be, repaired. In assimilation of insurance to a tax, the companies have been said to be

the mere machinery by which the inevitable losses by fire are distributed so as to fall as lightly as possible on the public at large, the body of the insured, not the companies, paying the tax. Their efficiency, therefore, and solvency are of great concern. The other objects, direct and indirect, of insurance we need not mention. Indeed, it may be enough to say, without stating other effects of insurance, that a large part of the country's wealth, subject to uncertainty of loss through fire, is protected by insurance. This demonstrates the interest of the public in it and we need not dispute with the economists that this is the result of the "substitution of certain for uncertain loss" or the diffusion of positive loss over a large group of persons, as we have already said to be certainly one of its effects. We can see, therefore, how it has come to be considered a matter of public concern to regulate it, and, governmental insurance has its advocates and even examples. Contracts of insurance, therefore, have greater public consequence than contracts between individuals to do or not to do a particular thing whose effect stops with the individuals. We may say in passing that when the effect goes beyond that, there are many examples of regulation. *Holden* v. *Hardy,* 169 U. S. 366; *Griffith* v. *Connecticut,* 218 U. S. 563; *Muller* v. *Oregon,* 208 U. S. 412; *Mutual Loan Co.* v. *Martell,* 222 U. S. 225; *Schmidinger* v. *Chicago,* 226 U. S. 578; *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549; *Noble State Bank* v. *Haskell,* 219 U. S. 104.

Complainant feels the necessity of accounting for the regulatory state legislation and refers it to the exertion of the police power, but, while expressing the power in the broad language of the cases, seeks to restrict its application. Counsel states that this power may be exerted to "pass laws whose purpose is the health, safety, morals and the general welfare of the people." The admission is very comprehensive. What makes for the general welfare is

necessarily in the first instance a matter of legislative judgment and a judicial review of such judgment is limited. "The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." *Chicago, Burlington & Quincy Railroad Co.* v. *McGuire*, 219 U. S. 549, 569.

The restrictions upon the legislative power which complainant urges we have discussed, or rather the considerations which take, it is contended, the business of insurance outside of the sphere of the power. To the contention that the business is private we have opposed the conception of the public interest. We have shown that the business of insurance has very definite characteristics, with a reach of influence and consequence beyond and different from that of the ordinary businesses of the commercial world, to pursue which a greater liberty may be asserted. The transactions of the latter are independent and individual, terminating in their effect with the instances. The contracts of insurance may be said to be interdependent. They cannot be regarded singly, or isolatedly, and the effect of their relation is to create a fund of assurance and credit, the companies becoming the depositories of the money of the insured, possessing great power thereby and charged with great responsibility. How necessary their solvency is, is manifest. On the other hand to the insured, insurance is an asset, a basis of credit. It is practically a necessity to business activity and enterprise. It is, therefore, essentially different from ordinary com-

mercial transactions, and, as we have seen, according to the sense of the world from the earliest times—certainly the sense of the modern world—is of the greatest public concern. It is, therefore, within the principle we have announced.

But it is said that the reasoning of the opinion has the broad reach of subjecting to regulation every act of human endeavor and the price of every article of human use. We might, without much concern, leave our discussion to take care of itself against such misunderstanding or deductions. The principle we apply is definite and old and has, as we have pointed out, illustrating examples. And both by the expression of the principle and the citation of the examples we have tried to confine our decision to the regulation of the business of insurance, it having become "clothed with a public interest," and therefore subject "to be controlled by the public for the common good."

If there may be controversy as to the business having such character, there can be no controversy as to what follows from such character if it be established. It is idle, therefore, to debate whether the liberty of contract guaranteed by the Constitution of the United States is more intimately involved in price regulation than in the other forms of regulation as to the validity of which there is no dispute. The order of their enactment certainly cannot be considered an element in their legality. It would be very rudimentary to say that measures of government are determined by circumstances, by the presence or imminence of conditions, and of the legislative judgment of the means or the policy of removing or preventing them. The power to regulate interstate commerce existed for a century before the Interstate Commerce Act was passed, and the Commission constituted by it was not given authority to fix rates until some years afterwards. Of the agencies which those measures were enacted to

regulate at the time of the creation of the power, there was
no prophecy or conception. Nor was regulation immediate
upon their existence. It was exerted only when the size,
number and influence of those agencies had so increased
and developed as to seem to make it imperative. Other
illustrations readily occur which repel the intimation that
the inactivity of a power, however prolonged, militates
against its legality when it is exercised. *United States* v.
*Delaware & Hudson Co.*, 213 U. S. 366. It is oftener the
existence of necessity rather than the prescience of it
which dictates legislation. And so with the regulations
of the business of insurance. They have proceeded step
by step, differing in different jurisdictions. If we are
brought to a comparison of them in relation to the power
of government, how can it be said that fixing the price of
insurance is beyond that power and the other instances of
regulation are not? How can it be said that the right to
engage in the business is a natural one when it can be
denied to individuals and permitted to corporations?
How can it be said to have the privilege of a private
business when its dividends are restricted, its investments
controlled, the form and extent of its contracts prescribed,
discriminations in its rates denied and a limitation on
its risks imposed? Are not such regulations restraints
upon the exercise of the personal right—asserted to be
fundamental—of dealing with property freely or engaging
in what contracts one may choose and with whom and
upon what terms one may choose?

We may venture to observe that the price of insurance
is not fixed over the counters of the companies by what
Adam Smith calls the higgling of the market, but formed
in the councils of the underwriters, promulgated in sched-
ules of practically controlling constancy which the ap-
plicant for insurance is powerless to oppose and which,
therefore, has led to the assertion that the business of in-
surance is of monopolistic character and that "it is illusory

to speak of a liberty of contract." It is in the alternative presented of accepting the rates of the companies or refraining from insurance, business necessity impelling if not compelling it, that we may discover the inducement of the Kansas statute, and the problem presented is whether the legislature could regard it of as much moment to the public that they who seek insurance should no more be constrained by arbitrary terms than they who seek transportation by railroads, steam or street, or by coaches whose itinerary may be only a few city blocks, or who seek the use of grain elevators, or be secured in a night's accommodation at a wayside inn, or in the weight of a five-cent loaf of bread. We do not say this to belittle such rights or to exaggerate the effect of insurance, but to exhibit the principle which exists in all and brings all under the same governmental power.

We have summarized the provisions of the Kansas statute, and it will be observed from them that they attempt to systematize the control of insurance. The statute seeks to secure rates which shall be reasonable both to the insurer and the insured, and as a means to this end it prescribes equality of charges, forbids initial discrimination or subsequently by the refund of a portion of the rates, or the extension to the insured of any privilege; to this end it requires publicity in the basic schedules and of all of the conditions which affect the rates or the value of the insurance to the insured, and also adherence to the rates as published. Whether the requirements are necessary to the purpose, or—to confine ourselves to that which is under review—whether rate regulation is necessary to the purpose, is a matter for legislative judgment, not judicial. Our function is only to determine the existence of power.

The bill attacks the statute of Kansas as discriminating against complainant because the statute excludes from its provisions farmers' mutual insurance companies, organized

and doing business under the laws of the State and in-
suring only farm property. The charge is not discussed
in the elaborate brief of counsel, nor does it seem to have
been pressed in the lower court. It is, however, covered
by the assignments of error.

The provision of the statute is, "That nothing in this act,
shall affect farmers' mutual insurance companies organ-
ized and doing business under the laws of this State and
insuring only farm property." The distinction is, there-
fore, between coöperative insurance companies insuring
a special kind of property and all other insurance com-
panies. It is only with that distinction that we are now
concerned. There are special provisions in the statutes
of Kansas for the organization of coöperative companies
and if the statute under review discriminates between them
the German Alliance Company cannot avail itself of the
discrimination. A citation of cases is not necessary,
nor for the general principle that a discrimination is valid
if not arbitrary, and arbitrary in the legislative sense, that
is, outside of that wide discretion which a legislature may
exercise. A legislative classification may rest on narrow
distinctions. Legislation is addressed to evils as they
may appear, and even degrees of evil may determine
its exercise. *Ozan Lumber Co.* v. *Union County Bank*, 207
U. S. 251. There are certainly differences between stock
companies, such as complainant is, and the mutual com-
panies described in the bill, and a recognition of the dif-
ferences we cannot say is outside of the constitutional
power of the legislature. *Orient Ins. Co.* v. *Daggs*, 172
U. S. 557.

                                    *Decree affirmed.*

MR. JUSTICE LURTON was not present when this case
was argued, and took no part in its decision.

MR. JUSTICE LAMAR, dissenting.

I dissent from the decision and the reasoning upon which
it is based. The case does not deal with a statute affect-

ing the safety or morals of the public. It presents no question of monopoly in a prime necessity of life, but relates solely to the power of the State to fix the price of a strictly personal contract. The court holds that fire insurance though personal is affected with a public interest and therefore, that the business may not only be regulated but that the premium or price to be paid to the insurer for entering into that personal contract can be fixed by law.

The fixing of the price for the use of private property is as much a taking as though the fee itself had been condemned for a lump sum—that taking, whether by fixing rates for the use or by paying a lump sum for the fee, has always heretofore been thought to be permissible only when it was for a public use. But the court in this case holds that there is no distinction between the power to take for public use and the power to regulate the exercise of private rights for the public good. That is the fundamental proposition on which the case must stand, and the decision must therefore be considered in the light of that ruling and of the results which must necessarily flow from the future application of that principle. For if the power to regulate, in the interest of the public, comprehends what is intended in the power to take property for public use, it must inevitably follow that the price to be paid for any service or the use of any property can be regulated by the General Assembly. This is so because the power of regulation is all-pervading, as witness the statute of frauds, the recording acts, weight and measure laws, pure food laws, hours of service laws, and innumerable other enactments of that class. And if this power be as extensive as is now, for the first time, decided, then the citizen holds his property and his individual right of contract and of labor under legislative favor rather than under constitutional guaranty. The principle is applied here to the case of insurance; but the nature of that business

and the intangible character of its contracts are such as to indicate the far-reaching effect of the principle announced, and warrants a statement of some of the grounds of dissent.

Insurance is not production; nor manufacture; nor transportation; nor merchandise. And this court in N. Y. Life Co. v. Deer Lodge Co., 231 U. S. 495, at the present term, reaffirmed its previous rulings that "insurance is not commerce," "not an instrumentality of commerce," "not a transaction of commerce," "but simply contracts of indemnity against loss by fire." Such a contract is personal and in the State whose statute is under consideration, insurance companies are classed among those "strictly private." Leavenworth County v. Miller, 7 Kansas, 479, 520. The fact, that insurance is a strictly private and a personal contract of indemnity puts it on the extreme outside limit and removes it as far as any business can be from those that are in their nature public. So that if the price of a private and personal contract of indemnity can be regulated,—if the price of a chose in action can be fixed,—then the price of everything within the circle of business transactions can be regulated. Considering, therefore, the nature of the subject treated and the reasoning on which the court's opinion is based, it is evident that the decision is not a mere entering wedge, but reaches the end from the beginning and announces a principle which points inevitably to the conclusion that the price of every article sold and the price of every service offered can be regulated by statute.

And such laws are not without English precedent. For while no statute ever before attempted to fix the price of a contract of indemnity, [1] yet under a Parliament that sat as a perpetual constitutional convention, with power

---

[1] The statute fixing the premium rates on surety bonds was held to be void in Am. Surety Co. v. Shallenberger, 183 Fed. Rep. 636.

to pass bills of attainder, to take property for private purposes and to take it without due process of law, many statutes approaching that now under review were adopted and enforced. Acts were passed by Parliament fixing the price of many commodities that were convenient or useful. These laws did not stop at fixing the price of property, but, like the present act they fixed the price of private contracts, and, by statute prescribed the rate of wages, and made it unlawful for the employé to receive or for the employer to give more than the wage fixed by law. It is needless to say that these laws were felt to be an infringement upon the rights of men; that they were bitterly resisted by buyer and seller, by employer and employé, and were a source of perpetual irritation often leading to violence. But the fact that the English Parliament had the arbitrary power to pass such statutes made them valid in law, though they were in violation of the inherent rights of individual. In time, the great injustice in this, was so far recognized that these laws, fixing the price of strictly private contracts, seem to have been repealed, and Lord Ellenborough, while enforcing, as proper, a rate for *public* wharfs, was able to say, in *Allnutt* v. *Inglis*, 12 East, 527, 538, "that the general principle is favored both in law and justice, that every man may fix what price he pleases for his own property or the use of it." But what was a favor in England, that might at any time be withdrawn, was in this country made a constitutional right that could not be withdrawn. For although the practice of fixing prices may have prevailed in some of the Colonies "up to the time of independence," yet, as Judge Cooley says, since independence "it has been commonly supposed that a general power in the State to regulate prices was inconsistent with constitutional liberty." Cooley's Const. Law (7th ed.) 807; Stickney's State Control of Trade, p. 3 and the abstract of English price-fixing statutes, p. 9 *et seq.* That common supposition is rightly founded on the fact

that the Constitution recognizes the liberty to contract and right of private property. They include not only the right to make contracts with which to acquire property, but the right to fix the price of its use while it is held, and the further right to fix the price if it is to be sold. To deprive any person of either is to take property, since there can be no liberty of contract and true private ownership if the price of its use or its sale is fixed by law. That right is an attribute of ownership. *State Tax Case*, 15 Wall. 232, 278, top.

But it may be said that, though insurance is a contract of indemnity and personal, its personal character has not been thought to preclude the many regulatory measures adopted and sustained during the past hundred years.

This is most freely conceded. But it is equally true that the failure for more than 100 years to attempt to fix the rates of insurance is indubitable evidence of the general public and legislative conception that the business of insurance did not belong to the class whose rates could be fixed. That settled usage is not an accident. For rate-making is no new thing, and neither is insurance. Its use in protecting the owner of property against loss; its value as collateral in securing loans; its method of averages and distributing the risk between many persons widely separated and all contributing small premiums in return for the promise of a large indemnity, has been known for centuries. All these considerations were recently pressed upon the court in an effort to secure a ruling that insurance was commerce. In refusing to accede to the sufficiency of the argument, the court in the *Deer Lodge Case* pointed out that the size of the business of insurance did not change the inherent nature of the business itself, saying that "the number of transactions do not give the business any other character than magnitude."

The character of insurance, therefore, as a private and personal contract of indemnity, has not been changed by

its magnitude or by the fact that more policies and for greater amounts are now written than in the centuries during which no effort has ever before been made to fix their rates.  It is, however, undoubtedly true that during all of that period *regulatory statutes* were, from time to time, adopted to protect the public against conditions and practices which were subject to regulation.  The public had no means of knowing whether these corporations were solvent or not, and statutes were passed to require a publication of the financial condition.  The policies were long and complicated, with exceptions, and qualifications, and provisos.  They were often unread by the policyholder and sometimes not understood when read.  Statutes were accordingly passed providing for a standard form of policy in order to protect the assured against his inexperience, to prevent hard bargains, and to avoid vexatious litigation, and as similar evils appear they may be dealt with by regulatory or prohibitory legislation just as statutes were passed and can still be passed to punish combinations, pooling arrangements, and all those practices which amount to unfair competition.

But these and those referred to in *Attorney General* v. *Firemen's Insurance Co.*, 74 N. J. Eq. 372, furnish instances of the exercise of this power to regulate which can be exerted against any person, trade or business, no matter how great or small.  This power to regulate is so much oftener exerted against the large business, because the evils are then more apparent, that the size of the business and the number of persons interested is sometimes referred to as indicating that the business is affected with a public interest.  But there is no such limitation.  For the power to regulate is the essential power of government which can be exerted against the whole body of the public or the smallest business.  And if, as seems to be implied, the fact that a business may be regulated is to be the test of the power to fix rates, it would follow, since all can be

regulated, the price charged by all can be regulated. Or if great size is the test, if the number of customers is the test, if the scope of the business throughout the nation is the test, if the contributions of the many to the value of the business is the test—or if it takes a combination of all to meet the condition,—then every business with great capital and many customers distributed throughout the country and making a large business possible, must be treated as affected with a public interest, and the price of the goods on its shelves can be fixed by law. Then could the price of newspapers, magazines and the like be fixed, because certainly nothing is more affected with a public interest, nothing is so dependent on the public, nothing reaches so many persons and so profoundly affects public thought and public business. Such a business is, indeed, affected with a public interest,—justifying regulation (*Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288), but not the fixing of the price of the paper or periodical or the rates of advertising. For great and pervasive as is the power to regulate, it cannot override the constitutional principle that private property cannot be taken for private purposes. *Missouri Pacific* v. *Nebraska*, 164 U. S. 403. That limitation on the power of government over the individual and his property cannot be avoided by calling an unlawful taking a reasonable regulation. Indeed, the protection of property is an incident of the more fundamental and important right of liberty guaranteed by the Constitution and which entitled the citizen freely to engage in any honest calling and to make contracts as buyer or seller, as employer or employé, in order to support himself and family.

It is said, however, that the validity of rate statutes has often been recognized, notably in the *Munn Case* (94 U. S. 113, 126) where a statute was sustained which regulated the price to be charged for storing grain in elevators.

The *Munn Case* is a landmark in the law. It is accepted

as an authoritative and accurate statement of the principle on which the right to fix rates is based. But the statute there under review did not undertake to fix the price of a personal contract, but to fix the price for the use of property, once private, but then public. The reasoning of the court clearly shows that in order to regulate rates, two things must concur—(1) the business must be affected with a public interest; and (2) the property employed in such business must be devoted to a public use. The basic principle of the decision was the oft quoted saying of Lord Hale that "when private property is affected with a public interest, it ceases to be *juris privati* only." The decision in the *Munn Case* was but an application of that terse statement and was applied in a case where the elevators had been devoted to a public use. This will distinctly appear from the statement by the court of the question involved and decided. For after reviewing and applying Lord Hale's pithy saying and reviewing the other authorities the court said (italics ours):

"Enough has already been said to show that, when private *property is devoted to a public use*, it is subject to public regulation. It remains only to ascertain whether the *warehouses* of these plaintiffs in error, and the business which is carried on *there*, come within the operation of this principle" (p. 130).

Not only does the *Munn Case* show that the right to fix prices depends on the concurrence of public interest and the employment of property devoted to a public use, but with the exception of the *Louisiana Bread Case*, 12 La. Ann. 432, it is believed that every American rate-statute since the requirement that property should not be taken without due process of law, related to a business which was public in its character and employed visible and tangible property which had been devoted to a public use.

The list of rate-regulated occupations is not too long to be here given. It includes canals, waterways and

booms; bridges and ferries; wharves, docks, elevators and stockyards; telegraph, telephone, electric, gas and oil lines; turnpikes, railroads and the various forms of common carriers, including express and cabs. To this should be added the case of the inn-keeper (as to which no American case has been found where the constitutional question as to the right to fix his rates has been considered), the confessedly close case of the irrigation ditches for distributing water (189 U. S. 439), and the toll mill acts. This of course does not include the case of condemnation for governmental purposes or for roads and ways where no question of rates is involved. There may be other instances not found, but it is believed that the foregoing numeration exhausts the list of what has heretofore been treated as a public business justifying the exercise of the price-fixing power against persons or corporations.

It is to be noted that in each instance the power to regulate rates is exercised against a business which in every case used tangible property devoted to a public use. Some of them had a monopoly (*Spring Water Co.* v. *Schottler*, 110 U. S. 347, 354). Some of them had franchises. Most of them used public ways or employed property which they had acquired by virtue of the power of eminent domain. They were therefore subject to the correlative obligation to have the use, of what had been thus taken by law, fixed by law. And as further pointing out the characteristics of the public use justifying the fixing of prices, it will be noted that, with the exception of toll mills (which, however, do employ property devoted to a public use), they all have direct relation to the business or facilities of transportation or distribution—to transportation by carriers of passengers, goods or intelligence by vehicle or wire;—to distribution of water, gas or electricity through ditch, pipe or wire; to wharfage, storage or accommodation of property before the journey begins, when it ends, or along the way.

When thus enumerated, they appear to be grouped around the common carrier as the typical public business and all employing in some way property devoted to a public use.

It will be seen, too, that the size of the business is unimportant, for the fares of a cabman, employing a broken-down horse and a dilapidated vehicle, can be fixed by law as well as the rates of a railroad with millions of capital and thousands of cars transporting persons and property across the continent.

The fact that rate-statutes, enacted and sustained since the adoption of constitutional government in this country, all had some reference to transportation or distribution, is a practical illustration of the accepted meaning of "public use" when that phrase was first employed in American constitutions, and when turnpikes and carriers, wharfingers and ferrymen had rates, tolls and fares fixed by law. No change was made in the meaning of the words or in the principle involved when it opened to take in new forms and facilities of transportation, whether by vehicle, pipe or wire, and new forms of storage, whether on the wharf or in the grain-elevator.

But it is said that business is the fundamental thing and the property but an instrument, and that there is no basis for the distinction between a public interest and a public use. But there is a distinction between a public interest—justifying regulation—and a public use—justifying price fixing. "Public interest and public use are not synonymous." *In re Niagara Falls Ry. Co.*, 138 N. Y. 375, 385. And since the case here involves the validity of a Kansas statute it is well to note that the Supreme Court of that State in *Howard* v. *Schwartz*, 77 Kansas, 599, recognizes that there is a difference and adjudges accordingly. It there cited numerous decisions from other States and in defining a public use, made the following quotation from the opinion of the Supreme Court of Maine:

"'Property is devoted to a public use when, and only when,  .  .  .  all the public has a right to demand and share in'" it "  .  .  .  In a broad sense it is the right in the public to an actual use, and not to an incidental benefit." (p. 608).

The effect of the difference between public use and public interest appears from the application; for the Supreme Court of Kansas on the authority of this and numerous other cases, held that a steam flour mill was not such a public use as would authorize its owners to exercise the power of eminent domain, though it was "a useful and important business instrumentality which contributed to the growth and development of the locality where the [mills] are situated. This may also be said, however, of every legitimate business. To a limited extent every honest industry adds to the general sum of prosperity and promotes the public welfare" (p. 609).

Nothing more can be said of insurance—nor can the power to take the private property of insurers, by fixing rates, be enlarged by a legislative declaration that the business is affected with a broad and definite public interest. For since the contract of insurance is private and personal, it is almost a contradiction in terms to say that the private contract is public or that a business which consists in making such private contracts is public in the constitutional sense. The fundamental idea of a public business, as well declared by the Supreme Court of Kansas, 77 Kansas, 608, is that "all the public has a right to demand and share in" it. That means that each member of the public on demand and upon equal terms, without written contract, without haggling as to terms, may demand the public service, and secure the use of the facility devoted to public use. If the company can make distinctions and serve one and refuse to serve another, the business *ex vi termini* is not public. The common carrier has no right to refuse to haul a passenger even if he has been

convicted of arson. But if an insurance company is indeed public it is bound to insure the property of the man who is suspected of having set fire to his own house, or whose statements of value it is unwilling to take. This is manifestly inconsistent with the contract of insurance which requires the utmost good faith, not only in making truthful answers to questions asked, but in not concealing anything material to the risk. If the company has the discretion to insure or the right to refuse to insure, then, by the very definition of the terms, it is not a public business. If, on the other hand, the company is obliged to insure bad risks or the property of men of bad character, of doubtful veracity or known to be careless in their handling of property the law would be an arbitrary exertion of power in compelling men to enter into contract with persons with whom they did not choose to deal where confidence is the very foundation of a contract of indemnity. Indeed, it seems to be conceded that a person owning property is not entitled to demand insurance as a matter of right. If not, the business is not public and not within the provision of the Constitution which only authorizes the taking of property for public purposes—whether the taking be of the fee for a lump sum assessed in condemnation proceedings, or whether the use be taken by rate-regulation, which is but another method of exercising the same power.

The suggestion that the public interest is found in the characteristics of the business of insurance, justifies a brief examination of those characteristics and a statement of the results that logically must follow from such a test. For if the power is to develop out of the characteristics, it must necessarily follow that other occupations, having similar characteristics, must be subject to the same rate-regulating power.

The elements which are said to show that insurance is affected with a public interest do not arise out of the size of any one company, but out of the volume of the aggre-

gate business of all the companies doing business within the State and beyond its borders. If that test be applied, and if the sum of the units is to determine whether or not a business is affected with a public interest (which is said to be the equivalent of a public use), then if the principle of the decision be applied to the business of farming all can see to what end it leads. In view of the amount of property employed and the aggregate number of persons engaged in agriculture and the public's absolute dependence upon that pursuit, it would follow that, farming being affected with a broad and definite public interest, the price of wheat and corn; cotton and wools; beef, pork, mutton and poultry; fruit and vegetables, could be fixed. Or if we take the aggregate of those who labor and consider the public's absolute dependence upon labor, it would inevitably follow that it, too, was affected with a broad and definite public interest and that wages in the United States of America in this Twentieth Century could be fixed by law, just as in England between the 14th and 18th centuries. And inasmuch as the prices of agricultural products are dependent on the price of land and labor, and as the price of labor is closely related to the cost of rent and food and clothes and the comforts of life, there would be the power to take the further step and regulate the cost of everything which enters into the cost of living. Of course, it goes without saying that if the rates for fire insurance can be fixed, then the rates for life and marine insurance can be fixed. By a parity of reasoning the rates of accident, guaranty and fidelity insurance could also be regulated. There seems no escape from the conclusion that the asserted power to fix the price to be paid by one private person to another private person or private corporation for a private contract of indemnity, or for his product, or his labor, or for his private contracts of any sort, will become the center of a circle of price-making legislation that, in its application, will destroy the right of

private property and break down the barriers which the Constitution has thrown around the citizen to protect him in his right of property—which includes his right of contract to make property, his right to fix the price at which his property shall be used by another. By virtue of the liberty which is guaranteed by the Constitution, he also has the right to name the wage for his labor and to fix the terms of contracts of indemnity,—whether they be contracts of endorsement or suretyship, or contracts of indemnity against loss by fire, flood, or accident.

In view of what Judge Cooley calls the general supposition that "the right to fix prices was inconsistent with constitutional liberty," it is not surprising that little is to be found in the books relating to a statute like this. It is, however, somewhat curious that among the few expressions to be found on the subject, is the intimation by Lord Ellenborough in *Allnutt* v. *Inglis*, 12 East, 527, 535, that insurance rates were not on the same basis as a public business using property devoted to a public use. For in answering the argument that if the rates of a public wharf could be fixed, insurance rates could also be fixed, he clearly intimates that this could not be done, since the wharf was a monopoly and "the business of insurance and of counting-houses may be carried on elsewhere."

In the following cases the statutes fixing prices have been held to be void. *Ex parte Dickey*, 144 California, 234, fixing the price to be charged by an employment bureau; *Ex parte Quarg*, 149 California, 79; *People* v. *Steele*, 231 Illinois, 340, prohibiting the sale of theater tickets at a price higher than that charged by the theater; *State* v. *Fire Creek Coke Co.*, 33 West Va. 188, limiting the profits on sales to employés. See also *State* v. *McCool*, 83 Kansas, 428, 430, bot., where in sustaining a statute regulating the weight of bread the court called attention to the fact that the statute did not attempt to fix the price. To these could be added a multitude of decisions showing that the power

to regulate is limited by the constitutional prohibition against the taking of private property. *Guillotte* v. *New Orleans*, 12 La. Ann. 432, is the only American case found which sustains the right to fix prices for other than a commodity or service furnished by a public utility company of the kind already pointed out. In that case the court said that the city could fix the price of bread and that if the baker did not desire to do business within the limits of such city he could go elsewhere. That reasoning would support any statute, for every citizen at least has the right to go out of business. But it has been repeatedly held by this court that such an answer cannot sustain an invalid statute, the Constitution being intended to secure the citizen against being driven out of business by an unconstitutional statute or regulation.

There is, in the opinion an allusion to usury laws as instances of fixing rates for other than public service corporations. We do not understand that the opinion is founded on that proposition, for even the usury laws do not fix a flat rate, but only a maximum rate, and do not require lenders to make loans to all borrowers, similarly situated, at the same rate of interest. Moreover interest laws were in their inception not a restriction upon the right of contract but an enlargement, permitting what theretofore had been regarded both as an ecclesiastical and civil offense. This fact may have been coupled with the idea that as the sovereign had the prerogative to coin money and make legal tender for all claims, he could fix the price that should be charged for the use of that money.

At any rate, interest laws had been long recognized before the Constitution and have been prevalent ever since. They, therefore, fall within the rule that contemporary practice, if subsequently continued and universally acquiesced in, amounts to an interpretation of the Constitution. But the same character of long continued ac-

quiescence and settled usage that sustains a usury law also sustains the right of the contracting parties to agree upon the charge for insurance. For centuries before the Constitution, and continuously ever since they have themselves fixed this charge, and this makes most strongly in favor of their right to continue to agree upon the price of a private contract of indemnity against loss by fire.

The act now under review not only takes property without due process of law but it unequally and arbitrarily selects those from which such property shall be taken by price fixing. Although including all other fire insurance companies, it excepts certain mutual insurance companies. *Persons* engaged in doing an insurance business are not within its terms. In Kansas, the right to do a fire insurance business is not limited to corporations, but may be conducted by persons, individuals, partners, companies and associations, whether incorporated or not. General Statutes of Kansas (1909), §§ 4086, 4091, 4122. And if it could be true that the legislature could fix the price of insurance it would seem to be doubly necessary that all doing an insurance business should be treated alike. There is no difference in principle and none by statute in the character of the contract, whether it is made by one man, or the Lloyds, or a corporation. There is no difference in the character of the contract made by a stock company and a mutual company. In each instance the contract is one of indemnity against loss for a fixed premium. If the policy-holder is a stockholder in an ordinary corporation, he may get back some of his premium by way of dividends; if he is a member of a mutual company, he pays his premium and gets back his share of the earnings. But to say that the State may fix the price to be charged for insurance by a stock company and that it will not fix the price to be charged by mutual companies or by the Lloyds, who do an enormous business of exactly the same nature on exactly

the same sort of property and on exactly the same terms, is to make a discrimination which amounts to a denial of the equal protection of the law.

THE CHIEF JUSTICE and MR. JUSTICE VAN DEVANTER concur in this dissent.