ÆTNA INS. CO. v. HYDE, State Superintendent of Insurance, et al., and 154 other cases.

District Court, W. D. Missouri. April 12, 13, 1929.

Nos. 962–1116.

Robert Follonie, of Chicago, Ill., Ashley Cockrell, of Little Rock, Ark., J. S. Leahy, of St. Louis, Mo., and William S. Hogsett, of Kansas City, Mo., for petitioners.

Floyd E. Jacobs and John T. Barker, both of Kansas City, Mo., and North Todd Gentry, of Columbia, Mo., for defendants.

Before STONE, Circuit Judge, and REEVES and KENNAMER, District Judges.

STONE, Circuit Judge. Section 6283, Rev. St. Mo. 1919, authorizes the superintendent of insurance of that state to reduce the rates of stock fire insurance companies, whenever the earnings of such companies, for five years, show "an aggregate profit therein in excess of what is reasonable," so as to limit the "aggregate collections by insurance companies in this state to not more than a reasonable profit." Section 6284 provides a review of such orders "by a proper action in the courts" wherein the "entire matter shall be treated and determined de novo" and pending which the rates fixed in such orders shall be in force.

Acting under section 6283, the superintendent made three orders reducing rates. The first was a reduction of 15 per cent. and was made January 5, 1922. Shortly thereafter, the companies filed a joint equitable action in the state court against the superintendent and a temporary restraining order was entered preventing enforcement of the order. A few days later, a stipulation was entered into between the parties to that suit, one result of which was rescission of the order by the superintendent. Although the above order is not involved in the present actions, the above stipulation and matters thereafter arising therefrom present one of the issues in these actions and will be discussed hereinafter.

The second order, made October 9, 1922, required a reduction of 10 per cent. in rates. A month later, all of the companies affected thereby joined in a review proceeding under section 6284 in the proper state trial court. That court set aside the order as unreasonable and confiscatory. On appeal to the state Supreme Court, the decree of the trial court was reversed. 315 Mo. 113, 285 S. W. 65. The Supreme Court of the United States granted a writ of certiorari. 273 U. S. 681, 47 S. Ct. 113, 71 L. Ed. 837. After hearing, the Supreme Court dismissed the writ on the sole ground that no federal question was presented. 275 U. S. 440, 48 S. Ct. 174, 72 L. Ed. 357.

While the above action for review was in course, the superintendent, on November 9, 1923, made a third order which required a reduction of 15 per cent. in rates.

Shortly after the above decision by the Supreme Court of the United States, 155 companies filed separate actions in this court against the superintendent and the Attorney General of the state for the purpose of enjoining the enforcement of the two orders made on October 9, 1922, and on November 9, 1923, respectively. Shortly thereafter, and before hearing in this court, the superintendent rescinded the order of November 9, 1923. The bills attack, in a similar manner, the order of November 9, 1923, and section 6283 as then amended (Laws Mo. 1923, p. 234), but the fact that this order was rescinded before hearing and the fact that the 10 per cent. order was made before amendment of section 6283 eliminate the 1923 order and the section as amended from our consideration. Taking the situation at the time of the hearing, our concern is with the validity of section 6283, unamended, and with the validity and the force of the order of October 9, 1922. As each of these cases involves the same issues, they were heard at one time, upon the applications for temporary injunctions, by a statutory court of three judges.

This hearing was upon the verified bills, motions to dismiss the bills, motions to dismiss the bills or to stay proceedings until complete restitution has been made to every policyholder in Missouri of any amount collected "in excess of such 10 per cent. reduction," affidavits and other testimony at the hearing.

Generally stated, the position of each complainant is that section 6283, as construed (315 Mo. 113, 285 S. W. 65) and as applied to it, in the light of its separate experience, is unreasonable and confiscatory, and therefore the order reducing rates by 10 per cent.

is void as to it. The attack of complainants may be placed under three general headings: First, the state has no power to regulate insurance rates; second, the regulation prescribed in section 6283 is violative of constitutional rights, and therefore that section is void; third, the method pursued by the superintendent in determining the basic facts for his action is unconstitutional, and therefore the order based thereon is void.

In their motions to dismiss and motions to dismiss or to compel restitution, defendants urge three matters as a bar to our consideration of the above contentions of complainants. These are as follows: First, that complainants are estopped to file or prosecute these bills by the terms of the above stipulation; second, that the matters presented in these bills are all foreclosed by the decision in the review proceedings under section 6283 —such decision being res adjudicata thereof; third, that without the restitution to policyholders demanded in the motions filed herein, the complainants come into equity with unclean hands and should be denied all relief, or, at least, denied relief until such restitution be made.

### The Stipulation.

Shortly after the reduction order of January 5, 1922, had been made, the companies affected thereby joined in an action in the state circuit (trial) court in Cole county, Missouri. This action was an ordinary injunction proceeding to prevent enforcement of that order. A restraining order was issued therein. At that stage of the controversy, the parties agreed upon a course of action which was embodied in a written stipulation. This is the stipulation urged by the present defendants as a bar to each and all of the present complainants. Of the present complainants, 33 were not parties to the stipulation (Complainants' Exhibit 3, printed copy, p. 7) and, therefore are not bound thereby. Our further discussion of the effect of the stipulation is applicable to, and only to, the complainants which were parties thereto. The stipulation is as follows:

"In the Circuit Court of Cole County, Missouri, November Term, 1921.

"Ætna Insurance Company et al., Plaintiffs, v. Ben C. Hyde, Superintendent of the Insurance Department of the State of Missouri, Defendant.

"Stipulation.

"Whereas, Ben C. Hyde, Superintendent of the Insurance Department of the State of Missouri, has this day withdrawn and revoked the order published and declared by him on the 5th day of January, 1922, effective February 15, 1922, reducing the rates of insurance charged by all stock fire insurance companies doing business in the State of Missouri on all fire, lightning, hail and windstorm business written by them in this State; now, therefore, it is hereby stipulated by and between the parties hereto that the following order may be entered of record in this cause:

"1. The above entitled cause is hereby dismissed, and the restraining order heretofore entered therein is hereby dissolved, and all liability under the bond given pursuant to the conditions of said restraining order is hereby satisfied and discharged, and the surety on said bond is hereby released.

"2. It is further stipulated and agreed that the said Superintendent of the Insurance Department, defendant herein, may, not earlier than March 15, 1922, call a hearing to investigate the necessity for a reduction in rates charged by the stock fire insurance companies doing a fire, lightning, hail and windstorm insurance business in this State; that at such hearing, if and when called, the stock fire insurance companies will appear by counsel and will produce such evidence as may be required by the Insurance Department, or they may see fit to present, bearing upon such question; that at such hearing the experience of said companies in the State of Missouri for the year 1921 shall be offered in evidence and considered by the Superintendent of the Insurance Department, together with such other evidence as may be offered in reaching his determination; that at the conclusion of such hearing the Superintendent of the Insurance Department will make findings of fact and announce his determination thereon and that he shall, in writing, find all essential, material and competent matters of fact disclosed by the evidence; that he shall make the following findings:

"(a) What was the profit of said stock fire insurance companies during the five years preceding said investigation, including the year 1921;

"(b) What is a reasonable profit on the business written in this State;

"(c) What per cent. of premiums received is allowed for the conflagration hazard;

"(d) What is the basis upon which earnings in Missouri should be determined and ascertained;

"(e) What is the ratio of expenses incurred to premiums earned in this State during said period;

"(f) What is the ratio of losses incurred

to premiums earned in this State during said period;

"(g) What is the total amount of earned premiums during said period.

"3. That if, based upon such findings of fact and the determination of the Superintendent of the Insurance Department, an order reducing the rates charged by such stock companies on all fire, lightning, hail and windstorm insurance business written by them in the State of Missouri be made by said Superintendent of the Insurance Department such order shall apply to all classes alike, and the said insurance companies, if dissatisfied with said order, will proceed to secure a review thereof by the trial de novo in the Circuit Court of Cole County, Missouri.

"4. That no injunction shall be applied for in said matter restraining the enforcement of said order, but pending such review and until the final determination of said cause in whatever court it may be finally lodged, the rates in force prior to the making of such order shall be collected by such insurance companies, and such insurance companies shall give bond, conditioned and in such amount as the court may direct, to refund to the assured any excess of premiums collected by them if such order of the Superintendent of the Insurance Department be finally sustained by decree or judgment of a court of last resort.

"5. That in such matter the question of the constitutionality of Sections 6283 and 6284, Revised Statutes of Missouri, 1919, shall not be raised, nor shall the legality of the hearing above provided for be questioned.

"Bates, Hicks & Folonie,

"Seymour Edgerton,

"John S. Leahy,

"Attorneys for the Plaintiffs.

"Jesse W. Barrett,

"Attorney General.

"Merrill E. Otis,

"Assistant Attorney General,

"Attorneys for the Defendant."

This stipulation dealt with the then situation and also looked to the future. There were four main purposes of the stipulation.

The first purpose was to dispose of the reduction order of January 5, 1922, and of the injunction suit against that order. This was covered by provisions reciting that the superintendent had that day "withdrawn and revoked" the reduction order of January 5, 1922; that the existing injunction suit against that order "is hereby dismissed and all liability upon the bond given by the complainants therein discharged."

The second purpose was to provide for conditions attaching to a subsequent hearing as to future reductions and any order entered thereon. This was covered by provisions that the superintendent should not call a hearing for rate reduction purposes before March 15, 1922; that, when such hearing might be called, the companies would appear and produce such evidence as required and as they might desire to present; that such evidence should include the "experience of said companies in the State of Missouri for the the year 1921," to be considered by the superintendent along with the other evidence introduced before him; that the superintendent should make written findings on "all essential, material and competent matters of fact disclosed by the evidence," including seven specified matters. As to any order of reduction entered upon such hearing it was provided that it should "apply to all classes alike."

The third purpose was to prescribe the method and only method which should be employed by the companies to test such future reduction order, with a statement of limitations and rights in connection therewith. This was covered by provisions that such test should be by a statutory review under section 6284, before the circuit court of Cole county; that no injunction should be sought therein nor should the validity of sections 6283 and 6284 or the "legality" of the hearing be raised; that until final determination of such test suit the companies should collect existing rates, giving bond "to refund to the assured any excess of premiums collected by them" if the order "be finally sustained."

The fourth purpose was to define what should be done by the companies if the reduction order be finally sustained. This was covered by a provision requiring bond to be given, in the above test suit, "to refund to the assured any excess of premiums collected by them" (the companies).

What occurred after the stipulation was executed was as follows: The first purpose was fully performed by both parties—the reduction order of January 5, 1922, was withdrawn; the injunction suit was dismissed and the bond given therein satisfied and discharged.

The second purpose was substantially carried out. After March 15, 1922, such hearing was had and the order of reduction (October 9, 1922), now in question, was entered by the superintendent. Complainants' only claim that the superintendent failed fully to follow the stipulation is that he failed to make any

190

of the seven specific findings required therein. Rather strangely, only a small portion of the order (the part ordering the reduction) is before us, either in the pleadings or the proof. When the review of this order (under section 6284) was before the Supreme Court of Missouri, the opinion therein sets forth some of the findings of the superintendent and epitomizes others. In the epitome, it is said: "The order recites further that, notwithstanding his request, the insurance companies refused to furnish the information agreed upon" in the stipulation. 315 Mo. 113, 122, 285 S. W. 65, 66. Also see opinion in same case in Supreme Court of the United States, 275 U. S. 440, 444, 48 S. Ct. 174, 72 L. Ed. 357. The portion of the order quoted in that opinion shows that some of the specific findings required by the stipulation were made by the superintendent. 315 Mo. 113, 122-123, 285 S. W. 65. The only evidence properly before us is a single sentence in the affidavit of Paul W. Terry to the effect that the superintendent "did not * * * make the findings specified in subdivisions (a) to (g) of paragraph 2 of said stipulation."

■ Because of the character and importance of this controversy and because of our knowledge (from the state Supreme Court opinion) that this statement in the affidavit is not, in all respects, accurate and because that opinion reveals the possible existence of a legal excuse for not making such findings (that the companies refused information), we would be justified in reopening the case for further testimony as to this alleged failure of the superintendent in relation to these findings required by the stipulation. This, however, is unnecessary because the undisputed evidence is that such deficiency, if it existed, was waived by the companies. This waiver is shown by their conduct after the action, or lack thereof, of the superintendent was fully known to them. When that knowledge was theirs, they had the right, if the superintendent had, without legal excuse, failed to comply with the stipulation, to repudiate the stipulation and freely take such action as they desired. They elected to proceed in accordance with the stipulation. They not only initiated the statutory review proceedings but omitted any attack upon the validity of the statute or the legality of the proceeding before the superintendent; gave the bond stipulated and collected the premiums stipulated. Their course through the state courts followed the stipulation. Therefore, we must regard the matter before the superintendent as having been fully performed, *in a legal sense,* by the

superintendent in accord with the stipulation because the only alleged failure upon his part has been waived.

The third above purpose of the stipulation was fully carried out by both parties.

The fourth purpose became active because the final determination was against the companies. The state Supreme Court upheld the order of reduction and the Supreme Court of the United States declined to interfere. The judgment of the state Supreme Court has become final. Nothing remains to be done by any one, under the stipulation, except for the companies to repay the 10 per cent. excess of premiums collected to those from whom they were collected. One of the expressed purposes of the present complaints is to prevent this repayment.

■ This being the situation at the time these complaints were filed, at the hearing and at present, are the defendants justified in asking that this court grant no relief until complainants have performed their remaining part under the stipulation and repaid these excess premiums collected?

Complainants attack the stipulation from several angles. They say it is without consideration; that it lacks mutuality; that the companies were under duress; that it was violated by the superintendent; that it has no application to the present suits; that it is invalid if it be construed to prevent bringing of the present suits; that the present suits are no violation of the stipulation because the attacks herein on the statutes are based upon the construction thereof by the state Supreme Court.

The contention as to lack of performance by the superintendent has been disposed of above.

■ The argument as to lack of consideration is based, principally, upon the claim that the advantages given by the stipulation to the companies were legal rights thereof. They say the revocation of the reduction order of January 5, 1922, was no consideration because that order was a nullity as it had been made without notice or hearing; that the stipulation provision for a hearing before any future reduction order be made was no consideration because they had a constitutional right to a hearing; that the provision that future reduction order should be tested by the statutory review proceedings gave nothing as the statute accorded the right to such form of review; that the provision allowing, pending the review proceedings, collection of existing rates was no consideration because void as being beyond the power of the superintendent—the statute requiring the

*reduced* rates to be applicable during the review. It is not necessary to examine and determine each of these contentions. It is enough to say that the stipulation actually secured for the companies definite benefits all of which they received. They escaped litigation concerning the reduction order of January 5, 1922, with the expenses and hazards thereof. They secured a delay of a month (February 14, 1922, the date of the stipulation, until March 15, 1922) of any action by the superintendent during which they received the existing premium rates. They secured the procedure as to hearing and review which, apparently, was satisfactory to them and which included collection and retention, pending the review, of the excess rates. They have had the benefit of that excess collection and have it yet. To say that positive and decided benefits did not flow to the companies through the stipulation does not accord with the facts. That the companies might have successfully litigated the order of January 5, 1922, or the present order, has no effect upon the validity of the stipulation now fully performed by the other party. An obvious purpose of the stipulation was to determine and agree upon a definite course of action which would avoid litigation as to the first order and confine litigation as to the second one. The claim that the superintendent had no power to agree to collection and retention of the excess pending the stipulated review is beside the mark because the companies have received the entire benefit of that provision which is fully executed. We have no doubt as to the sufficiency of the consideration.

The contention as to lack of mutuality is not much pressed. It is coupled and presented with the claim of lack of consideration. We can see no basis for any contention that there were not mutual obligations all of which have been met or waived except the final one of repayment by the companies.

As to duress—no facts are here to support such a contention. The stipulation was fully and freely entered into by all parties.

The remaining attacks upon the stipulation are that it has no application to the present actions; that if so applicable it is invalid and that these actions are not violations of the stipulation because based upon the invalidity of the statutes *as construed* by the state court in the review proceedings. The obvious intent of the parties was to confine attack upon a future reduction order to a stipulated procedure. That procedure was authorized (section 6284). The companies could and did waive resort to other forms of attack open to them. The companies recognized this meaning of the stipulation and litigated, in accordance with the stipulation, for more than five years and through every possible court. They stipulated that if *that* litigation were unsuccessful they would repay the excess premiums collected under the stipulation. They made no reservations concerning the law which might be announced by any court in the course of that litigation. Even if they could now begin an entirely new and different attack upon the order of reduction, such condition would not meet the claim of defendants that they are coming into a court of equity with unclean hands, because they stand as beneficiaries under a stipulation respecting this very matter and which they refuse to carry out. We think this position of defendants is well taken. The underlying principle in the equitable rule of "unclean hands" is that a court of conscience will not grant relief to one who, at the time, is acting inequitably in connection with the subject-matter of the controversy. We express no opinion thereon, but it may be that the stipulation was not intended to or that it could not prevent the complainants bringing separate actions to attack the reduction order, either through invalidity of the statutes upon which power to make the order must rest or through defects inhering in the particular order, but the facts remain that the stipulation required repayment of the excess collections if a particular stipulated proceeding resulted adversely to these complainants; that such result occurred; that every benefit to complainants from the stipulation has been received by them; that those benefits are very substantial and that they refuse to refund. Unless they do so, they will rob the other parties to the stipulation of every possible benefit therefrom, although such parties have fully performed the stipulation upon their part. Such action by the complainants is highly unconscionable and should not be permitted by a court of equity. It is analogous to that of parties to a contract where the complainants seek to act upon a rescission of the contract while retaining substantial fruits thereof. There, a court of equity will compel a restoration of the status quo before examining the rights of the parties. Here, the complainants are seeking to avoid the effect of the stipulation while retaining every substantial benefit thereof. They should comply with the stipulation and make the refunds required thereby before asking any equitable relief. When that status has

been fully established they will be in position to proceed to have their rights determined and protected and not before.

It is argued that to require this repayment would result in injustice to these companies if it should be determined later that the order was confiscatory as to them, or any of them, because it would be impossible ever to recover back the repayments thus made to the policyholders. It is probable that such recovery would be impossible, or, at any rate, highly improbable. But such result is no reason for granting the injunctions. If that is the result, it is one which they have voluntarily brought upon themselves. It does not excuse them nor justify this court in disregarding a basic prerequisite to the exercise of equitable powers. The so-called "rule of convenience" which leads courts of equity to preserve a status until the rights of the parties can be determined has no application here. The situation here is that equity will not move to protect the rights of a party until that party has placed itself in a position where it can ask a court of equity for such protection. As to each of these complainants who were parties to the stipulation the prayer for temporary injunction should be denied without prejudice to renewal upon a showing of the above refund by the particular complainant seeking such renewal.

The above view as to the effect of the stipulation makes it unnecessary, at this time, to determine the other matters raised by defendants, in so far as such matters relate to these complainants which were parties to the stipulation.

### Companies Not Parties to Stipulation or State Review Proceedings.

The remainder of this opinion, except the "Conclusion," will deal with the complainants who were not parties to the stipulation and, therefore, not subject to the above disposition. Also, these companies were not parties to the statutory review proceedings. Hence, they are not subject to any of the issues of stipulation, restitution, or res adjudicata pre-, sented in the motions filed by defendants. The present complaints of such companies are to be determined upon the issues presented in those complaints and the evidence introduced.

Counsel for complainants urge ten points in their brief supporting these applications. for temporary injunction. Some of these can be readily determined. Points I and II are that "This court has jurisdiction" and that "Plaintiff has property in Missouri within the protection of the Fourteenth Amendment." Point IX is that "The instant proceeding is the type of proceeding specifically pointed out by the Supreme Court as the appropriate one." We have no doubt that this court has jurisdiction and that this is a proper proceeding in which to determine the validity of this reduction order and to afford such equitable relief as is prayed and is required by the facts in order to protect any rights of each complainant under the Fourteent Amendment. Point X is that "Irreparable injury to plaintiff will result unless an interlocutory injunction is granted." In so far as this point may be regarded as urging the propriety of resort to an injunction proceeding to protect the rights complained of as having been violated, the point is well taken. As to whether such injunction should issue will, of course, depend upon the rights of the parties as hereinafter determined.

Points VI, VII and VIII have to do with the attack upon the reduction order of November 9, 1922. As that order was revoked before this hearing and is no longer effective, those points may be disregarded.

Point V has to do with the order of October 9, 1922, and is an attack upon the validity of section 6283. It is stated thus: "Section 6283, R. S. Mo. 1919, is unconstitutional."

Section 6283, Rev. St. Mo. 1919, contains the entire authority under which the superintendent of insurance of that state made the order of reduction of October 9, 1922, which is involved in these actions. It is as follows:

"Sec. 6283. *Superintendent to investigate the reasonableness of rates—Authority to order reductions.*—The superintendent of insurance, upon written complaint of any citizen, or upon his own motion, is hereby empowered to investigate the necessity for a reduction of rates, and if, upon such investigation, it appears that the result of the earnings in this state of the stock fire insurance companies for five years next preceding such investigation shows there has been an aggregate profit therein in excess of what is reasonable, he shall order such reduction of rates as shall be necessary to limit the aggregate collections by insurance companies in this state to not more than a reasonable profit. Any reduction ordered by the superintendent of insurance shall be applied, subject to his approval: Provided, that the superintendent of insurance shall designate the class or classes to which the reduction shall be applied if the companies do not, within thirty days from the order of reduction, submit a class or classes which meet his approval. In

determining the question of rates and profits in accordance with this article, the superintendent of insurance shall give proper and reasonable consideration to the conflagration liability, both within and without the state. (Laws 1915, p. 313.)"

This section was amended in 1923, but, as this amendment became effective after this order was made, we are not concerned with that amendment because the power to make this order must be measured by the section as it stood when the order was made. Ætna Ins. Co. v. Hyde, 315 Mo. 113, 127, 285 S. W. 65.

This section has been under consideration of the Supreme Court of the state and of the United States. Ætna Ins. Co. v. Hyde, 315 Mo. 113, 285 S. W. 65; Id., 275 U. S. 440, 48 S. Ct. 174, 72 L. Ed. 357. The state Supreme Court has construed it in certain respects as follows: That "profits" mean aggregate profits (page 128 of 315 Mo. [285 S. W. 68]); that in calculating "profits", investment earnings are not to be taken as income (pages 129, 138 [285 S. W. 69, 73]), *unearned* premiums (pages 132–137, 152 [285 S. W. 70–73, 80]); and interest on unearned premiums (pages 137–141 [285 S. W. 73–75]) are to be taken as income and losses and expenses *paid* are to be taken instead of those *incurred* (pages 134, 154 [285 S. W. 71, 81]); elements affecting the probable future effect of the order may be considered (pages 142–145 [285 S. W. 75–77]). The discussion of other matters in that opinion—such as excessive commissions, income tax, war tax and fraudulent losses—seem expressions as to facts rather than any construction of the statute. The Supreme Court of the United States construed section 6283 as requiring "consideration en masse of the 'result of the earnings' of all the companies, and, upon finding an excessive 'aggregate profit,' it becomes the duty of the superintendent to limit the 'aggregate collections' to not more than a reasonable profit." 275 U. S. at page 446, 48 S. Ct. 176 (72 L. Ed. 357). That court further says: "Neither of the sections [6283 or 6284] authorized a determination of the reasonableness of rates when applied to the business of any company." Page 448 of 275 U. S. (48 S. Ct. 177).

■ Under point V, these complainants urge several grounds of invalidity of the statute as thus construed. Some of these may be shortly eliminated. Rather half-heartedly, the challenge of the power of the state to regulate such rates is made. That power is sustained in German Alliance Ins. Co. v. Kansas, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189.

■ The contention that the statute is invalid in applying only to "stock fire insurance companies" is not sound. The power of the state to make reasonable classifications for purposes of police regulation is beyond dispute. The only question which can arise is as to the reasonableness of the classification made. The classification here is between fire and other forms of insurance and between stock and mutual companies. Each of the bases is reasonable and natural. Fire insurance is a distinct legal and business classification. The distinction between stock and mutual insurance companies has been approved in German Alliance Ins. Co. v. Kansas, 233 U. S. 389, 418, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189, and some reasons therefor are well expressed by Judge Ragland in Ætna Ins. Co. v. Hyde, 315 Mo. 113, 150, 285 S. W. 65.

■ The contention that the section is invalid because it delegates the administration of legislative power, but wholly fails to prescribe any standard, rule or guide for the exercise thereof, is unsound. The wording of the statute and the construction thereof by the Supreme Courts of the nation and of the state have outlined a guide for the action of the superintendent.

■ The contention is, also, that the statute is invalid in not requiring notice and a hearing prior to making reduction orders. We need not inquire whether such notice and hearing is a legal requirement because neither the wording nor any proceeding thereunder prevents such notice and hearing and both were accorded in this instance.

■ There remain five grounds of attack, under point V, upon the section to be examined. The first is that the "aggregate" method required by the section is invalid because such method takes no account of the particular circumstances and facts governing the profit of the particular complainant company but is based upon aggregate profits determined by aggregate expenses and income of all such companies in the state. The section clearly requires (315 Mo. 113, 128, 285 S. W. 65) and permits (275 U. S. 440, 446, 48 S. Ct. 174, 72 L. Ed. 357) only the aggregate method of ascertaining profits for the purpose of making a reduction order. Is this invalid because it takes no account of the situation as to each or a particular individual company nor of the effect thereon of the order made? The distinction to be kept in mind is between the legislative and the judicial pow-

er. The Legislature may use any reasonable method to carry out its purposes. The judiciary may then examine the results of such action upon any one affected thereby and determine the validity of such results as to that party—such results may be judicially found to be just as to some and unjust as to others. Whether the legislative method is reasonable depends upon conditions surrounding the purpose of the legislative action. Here, the Legislature desired to regulate insurance rates. Well known business conditions suggested the advisability of a common rate for all companies upon the same classes of risks. The legislative problem was, in a practical sense, not an individual company matter but a composite or general or aggregate matter to be determined from general facts and circumstances rather than from individual experiences. This method of legislative procedure is old and has never, ipso facto, been judicially condemned. For years, the state Legislatures enacted laws broadly fixing railroad charges at certain flat rates. The method of securing constitutional protection therefrom was not by striking down the law as a whole but by according to each individual carrier the right to test the effect of the law upon it—if the result was confiscation, the law was invalid as to that particular company, if it was not confiscatory, it was valid as to the particular company. Such seems to be the view of the Supreme Court as to this section. 275 U. S. 440, 447, 48 S. Ct. 174, 72 L. Ed. 357. Our conclusion is that the section is not invalid because it uses the aggregate method but that any company affected by a reduction order thereunder has the right to test the validity of the order when applied to it on the ground that the effect thereof is confiscatory as to it, and, if such contention be sustained, to be relieved therefrom.

The four remaining grounds of attack, under point V, are based upon contentions urged to be true even though the aggregate method be valid. One of these is really a matter not affecting the validity of the section but pertinent to an investigation of facts thereunder. That is the claim that, in determining expenses, deduction may be made for excess commissions paid agents in St. Louis. The statute requires ascertainment of "aggregate profits" for a five-year period for the purpose of determining a future reasonable aggregate profit. If it were an original proposition, we would say that the only *requirement* of the section was that the aggregate method should be employed. What matters should be considered as bearing on in-

come or expenditure in ascertaining such "aggregate profit" would, we think, be left to the superintendent within the bounds of reason and law—that is, that any and all pertinent facts might be considered by him and no others. The Supreme Court of Missouri has determined that certain matters are required by the section and we accept that as a construction of the section, but it has not so determined as to this particular matter of excess commissions. Therefore, we think the only place thereof is in an examination of the facts as to the effect of the order on the particular complainant.

Another contention is that the section is invalid because the state Supreme Court construed it as requiring the deduction from expenses of federal war taxes on Missouri premiums. The only respect in which the state court can be said to have construed the section in that particular is that it determined that the superintendent was authorized thereunder to consider future conditions which would affect any rate he might order. Any rate established by the superintendent would be for future application. Any circumstances known or probable affecting that future would be pertinent to the inquiry. McCardle v. Indianapolis Water Co., 272 U. S. 400, 408, 409, 412, 47 S. Ct. 144, 71 L. Ed. 316; S. W. Tel. Co. v. Pub. Serv. Comm., 262 U. S. 276, 288, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 691, 43 S. Ct. 675, 67 L. Ed. 1176. In the McCardle Case, 272 U. S. 408, 47 S. Ct. 148, Mr. Justice Butler said: "In every confiscation case, the future as well as the present must be regarded." We think the state court was right in such construction of the statute. It is admitted that the repeal of the law levying this tax would prevent its being an expense during the period of the order although it had been such during the prior five-year test period under examination by the superintendent.

Two contentions under point V remain. They are, that the section as construed is invalid, first, in that underwriting profit or loss shall be on the basis of premiums *paid* less losses and expenses *paid*, instead of on the basis of premiums *"earned"* less losses and expenses *incurred;* and, second, in that interest earnings on "unearned" premiums are included as income. *As attacks upon the validity of the section*, these contentions have no place *in the present proceedings.* Whether they would be in the statutory review proceeding under section 6284 is not here pertinent. The *present proceedings* are separate complaints by certain individual companies

affected by the order. The prime question before us in each of these actions is: Is the order confiscatory in effect upon the particular complainant? We are concerned only with the effect of such result upon the particular complainant. If the effect of the reduction order is confiscation as to a particular complainant, the order is void as to it. If that effect is not confiscatory, the complainant is without remedy so long as the superintendent has acted within the power conferred by the section as construed by the highest court of the state. There is no contention here that he has acted outside of such power.

In determining the matter of confiscation in the present suits, we are not bound nor affected by the statute. We are guided solely by the rules of evidence in a federal trial court in the determination of the crucial *fact* of confiscation vel non. When a right under the federal Constitution is in question before a federal court, it applies its own rules of evidence in the investigation of facts material to such issue. It is in that connection alone that the propriety of the paid premiums, loss and expenses or the earned premiums and incurred loss and expenses methods are to be considered and the propriety of treating interest earned on unearned premiums as income.

Our conclusion is that the statute as construed is valid in so far as these complainants can test that matter in these proceedings.

Complainants state contention IV as follows: *"It is an unconstitutional invasion of the rights of the plaintiff to base a rate reduction upon the experience of competitors of plaintiff without weighing its confiscatory effect upon the plaintiff individually."*

Taking this contention as stated, it is unsound for reasons above given. No right of plaintiff is invaded by such a method per se unless it results in confiscation when applied to it. In fact, it is the result and not the method which is important to plaintiff. Under the section, the superintendent has power to limit the collections of each company to a reasonable amount and to do so through the medium of fixing rates. No company has a constitutional right to charge a rate which will produce more than a reasonable profit. Every company has a constitutional right to receive a reasonable profit. In its attempt to select a method of regulating such rates to produce only a reasonable profit, the state Legislature has a wide choice. It is not required to treat each company separately upon its own facts. Nor is it required to consider the effect of its action upon each individual company. The only limitation is that its action must not be arbitrary to the harm of the companies. Such action is not arbitrary if it has a reasonable connection with the existing circumstances. Here, three of such circumstances are that there are a great many companies (making it impractical to consider each separately); that practical business considerations compel a similar rate for all companies (making it practical to prescribe a flat rate applicable to all and entirely impractical and, in a business sense, useless to prescribe for each company different rates dependent upon its particular experience); and that the national Constitution affords protection, through the courts, to any individual company as to which the flat rate might be confiscatory (thus furnishing relief in those instances where the flat rate might, in its application, be too low and leaving it in effect where not too low). The above circumstances would make reasonable the method of section 6283 for determining a rate to produce a reasonable profit, as construed by the state Supreme Court.

### Confiscation.

The remaining contention (III) to be considered is that "The 10 per cent. reduction order and the 15 per cent. reduction order are each confiscatory as to each plaintiff." For reasons hereinbefore stated, we have no concern with the "15 per cent." order, which was the order of November 9, 1923, rescinded before the hearing in these actions.

Each of these complaints presents an attack upon the order of reduction because, it is claimed, the order is confiscatory as to the particular claimant. As so often happens in important rate controversies, the evidence as to this matter of fact before us on these applications for temporary injunctions is meager, general and, in many respects, incomplete and unsatisfactory. It is largely made up of the verified bills and affidavits. The argument under point III of the brief is short and general. However, under point V there are four matters urged which may be properly considered in connection, also, with the question of confiscation because they deal with general matters applicable to all of the cases and have direct bearing upon some of the facts and upon the bases which should be kept in mind in determining the ultimate and controlling fact of existence or non-existence of confiscation. After discussing these four matters we can examine and apply the facts in each particular case. Of these four contentions, two are, perhaps, of less practical

importance. They are the war tax and the excess commissions to agents in St. Louis.

### War Tax.

This matter involves the propriety of eliminating the federal war tax from expenses of the companies. During the particular five-year test period (1917–1921, inclusive) involved in the investigation of the superintendent under section 6283, the companies were subject to and paid a federal war tax. This expenditure properly appeared as an expense during that period. That tax was repealed by the Act of November 23, 1921 (42 Stat. 227, 321). Under the reduced rate, there would, of course, be no such tax and no such expense. Therefore, the superintendent was authorized, under section 6283, and we are authorized, by recognized rules of law in rate cases (McCardle v. Indianapolis Water Co., 272 U. S. 400, 408, 409, 47 S. Ct. 144, 71 L. Ed. 316; S. W. Tel. Co. v. Pub. Serv. Comm., 262 U. S. 276, 288, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 691, 43 S. Ct. 675, 67 L. Ed. 1176), to eliminate that as an item of expense in considering the effect of the reduction order upon these complainants.

### Excess Commissions.

The excess commissions paid agents in St. Louis came into the controversy in this wise. In determining what the aggregate profit of the companies was, the superintendent deducted from their expenses certain excess in commissions paid by them to their agents in St. Louis. It is conceded that agent commissions in St. Louis ran about 5 per cent. in excess of commissions paid in other places in the state. It is claimed by the companies that they were forced to pay this excess by business conditions in St. Louis. Those conditions were that brokers controlled the placing of a large portion of the insurance written and they charged the insurance agents a commission for placing the business with them. In a rate investigation, items of expense may be examined to ascertain whether they are in part or as a whole proper. On one hand, a company must have a wide discretion in the management of its own business, but, on the other hand, it cannot make expenditures which are clearly unnecessary and pass such into a rate charge. Its business must be "well and economically organized and carried on." Ætna Ins. Co. v. Hyde, 275 U. S. 440, 448, 48 S. Ct. 174, 177 (72 L. Ed. 357). From the meager showing in this record, we cannot say that this expense is so unreasonable that it should be eliminated. The real vice is that this excess is spread over upon other business in the state which did not cause it, while the burden is, thereby, lightened on the very business which has caused it. We see no reason why the superintendent could not, under the statute, have made a difference in the rates as applied to St. Louis which would have placed this burden where it belonged. This was not done. In considering the expenses of each of these complainants, we think these excess commissions should not be deducted from the expenses of such of these complainants as paid them. Whether fuller evidence upon this item might justify its exclusion is a matter we cannot determine now.

### Rate Basis.

Two contentions remain to be considered. One is that profit should be determined by consideration of the *"earned"* premiums and the *incurred* losses and expenses, instead of *paid* premiums and *paid* losses and expenses. The other is whether interest upon "unearned" premiums should be included as income. In a practical sense, these are the most important contentions in these cases— as stated in complainants' brief, it is "the basis upon which its bill rests" and, as stated in the opinion of the Supreme Court in the statutory review proceedings of this order, "the controversy concerns the basis on which the findings were to be made." 275 U. S. 440, 446, 48 S. Ct. 174 (72 L. Ed. 357).

The object is to ascertain the "profit"— this naturally represents the difference between income and expenditures. The parties differ as to what is the basis for computing income, and, also, as to the basis for computing expenditures.

The difference as to *income* is whether the basis should be premiums "paid" or premiums "earned." Premiums "paid" means such as are actually paid by the insured to the insurer during a given test period. Premiums "earned" requires more extended definition. Therefore, before entering upon a determination as to these contending bases as to "income," it is advisable to state a definition of the terms "earned" and "unearned" premiums and the place and use thereof in the fire insurance business. The fire insurance business is not one of dealing in commodities or things but of furnishing a service. That service is indemnity from loss by fire. Such service is based upon contracts whereby the insurer assumes the obligation to indemnify. The consideration for this obligation is a pay-

ment by the insured therefor. This payment is called a premium.

As soon as a premium is paid and the indemnity is in force, the premium becomes the absolute property of the insurer. It is the price and compensation paid for the indemnity obligation assumed by the insurer. It has been finally *earned* in every sense of that word by the binding contract obligation to indemnify. Therefore, the terms "unearned" and "earned" premiums are inaccurate unless the sense in which they are used is understood. Those terms are used in two connections: Cancellation of policies and the protective reserve. Policies usually provide for payments by the insurer to the insured upon the happening only of either or two contingencies: Loss within the policy and cancellation of the policy. The former is the indemnity contracted for; the latter is the amount to be paid if the policy be cancelled by either party while it is in force. Neither loss under the policy nor cancellation is a certain matter. Each is entirely contingent. Either or both may never occur and, in fact, it is because such occurrence is the exception that the insurance business is a possibility.

As to cancellation of policies: From the lack of stress placed by counsel upon any effect on an insurer through cancellation of policies, it is fair to assume that it is negligible. However, because we are dealing with terms which need definition and because those terms are used in connection with the cancellation of policies it is well to ascertain their use and meaning in that respect. Policies provide for cancellation by either party during the life of the policy. The premium is paid for indemnity during the full term of the policy. As cancellation terminates the indemnity liability of the insurer before the full term for which the insured has paid, policies provide for repayment of that portion of the premium which paid for the term remaining after cancellation. As one of the bases of the amount of premium paid is time (the rate relatively decreasing as the term of insurance increases), determination of the amount to be repaid, upon cancellation, depends partly upon which party declares cancellation. To prevent the insured securing short term protection at lower long term rates, if he cancels he is paid the difference between the premium paid and the short time rate for the time he was protected. To prevent the insurer forcing short time rates on an insured who has contracted for long term rates, if the insurer cancels, the payment is the long term rate on the term remaining after cancellation. To designate

these amounts which must be paid the insured, upon cancellation, they are called "unearned" premiums, while the premium for the term before cancellation is called "earned" premium. Such payment to the insured is not a *return*, in specie, of any part of the premium paid and the contract for cancellation does not establish any trust or similar relation regarding the premium. It is merely a contract obligation wherein the amount to be paid the insured has relation to and is, in part, measured by the amount of premium paid for the policy.

As to the reserve: This has to do with losses under the policies. Although such losses are the exception, they occur. They may happen at any time upon any of such contracts and should, under the contract, be promptly paid. The insurer must be always in a financial position to make such payment. Good business intelligence and integrity would require the maintenance of a liquid fund proportioned to the existing risks. When an insurance business starts, this fund is provided by the capital stock. State statutes usually require a minimum capitalization. As the business grows and the total of assumed risks increases, the fund must be correspondingly increased. Well managed companies carry such "surplus" as seems advisable for such purpose. Naturally, the management of companies would differ as to how much of its income (including premiums) should be thus reserved and how much paid out in dividends. To assure a sufficient reservation for the protection of the policyholder, the States have enacted laws. The basic thought in most of such laws is to secure this protection through reinsurance in some other and solvent company. This is worked out by requiring a fund sufficient for that purpose. As premium rates are the same in all companies—by law or by business necessity—the premiums for the unexpired terms of the policies are sufficient for the above purpose. Hence, the usual requirement is that the fund at all times equal the premiums on the unexpired terms of the policies in force. To describe this amount, it is called the "unearned" premium. The balance of the premium is called "earned" premium. This term "unearned" premium does not mean that the entire premiums have not been *earned* in the sense that they are absolutely the property of the insurer. It does not mean that the insurer must take nine out of every particular $10 paid as premium on each policy and set that specific $9 aside. It does not mean that any trust or agency or other legal relation exists as to any part

of any specific premium. What it does mean is that the insurer shall have and keep a fund of that amount constantly available for that purpose and that purpose alone. In short, it cannot distribute that much of its assets in dividends nor use it for other corporate purposes. In order to be sure that this fund is secure, different requirements are made. Some states require this segregation to be by physical deposit of approved securities in designated depositories. Ordinarily, it is merely a matter of bookkeeping by the insurer, enforced by examination of its books and securities by representatives of the state.

Having in mind the above meaning of the terms "earned" and "unearned" premium, we return to the contention between the parties. Plaintiffs contend that *income* should be based upon the "earned" premiums alone and that no account should be taken of the "unearned" premiums; defendants contend for *paid* premiums, which would include both "earned" and "unearned" premiums, together with interest received by the companies from investments representing the "unearned" premium. Comparison of these two contentions reveals two real points of difference. The first of these is whether "unearned" premiums shall be included in income. The second is whether interest upon invested "unearned" premiums should be included.

While by no means unimportant, it is well to get the matter as to interest out of the way before reaching the main issue—inclusion of "unearned" income. The interest on "unearned" premiums should not be included as underwriting income.

The principal business of an insurance company is in assuming risks in return for pay. To assure prompt performance of its contracts it must build up on and keep on hand funds necessary for that purpose. One source of profit is the investment of that fund to produce an income. That fund must be fairly liquid, so the result is that such investment usually takes the form of readily marketable interest-bearing securities. This interest is the above profit. Thus, an important branch of such business is the investment of its funds. While the various states require a minimum fund (amount to reinsure) yet prudent management dictates a yet larger amount. Thus, the best companies have built up and maintain a "surplus" which represents funds not legally required as a reserve and which might be used for any corporate purpose, including dividends. For the most part, this surplus is the result of receipts from premiums. All parties here concede that such surplus and the income

therefrom is not to be considered in estimating income for rate-making purposes under the Missouri statute. Yet the defendants contend that the interest from the "unearned" premiums should be so included. Such interest is alone the result of investment by the company and is not the result of state requirement. That investment is not different in character and purpose from that of the "earned" premiums or of any other assets of the company.

As soon as a premium is paid, it becomes the absolute property of the company and subject to investment by it. Premiums are coming in daily. They are mingled with other funds from other sources and invested together and alike. The fact that money comes from "earned" or "unearned" premiums or other sources has and should have nothing to do with its investment. All income property of the company, except the contributions from its stockholders, is directly or indirectly traceable to premiums. To say that earnings on some recently paid portion of premiums are so-called underwriting profit while earnings on more remote portions are investment profits is a purely artificial distinction. To base this upon "unearned" premiums is no more real because "unearned" premiums is merely the name for the measure of the fund which is required to be kept to secure the indemnity contracts—there is no logical nor practical connection between the two thoughts. Therefore, because the premium when paid is the property of the company, because the interest arises from investment of such property, because there is no basis for such result in the fact that a reserve must be maintained (measured by the premium required to reinsure) and because it is conceded that the income from the investment part of the business should not be considered in a rate-making base under this statute we think there is no ground for holding that interest from "unearned" premiums should be included as "income" for rate making purposes in these cases. Whether it could be included without violating constitutional guaranties is not in these cases and not considered herein.

The next matter is whether "unearned" premiums should be excluded as income. Plaintiffs urge this should be done because, they say, such premiums are not theirs to do with as they wish and may never be theirs. As soon as a premium is paid it is the property of the company. The company invests it precisely as it does any other monies it may have. The insured has parted with it completely. He has no kind of legal or

equitable interest therein. All that he has is the contract obligations of the policy. It is true that business prudence and state regulations require the maintenance of a fund to secure the performance of such outstanding contracts and that this fund cannot be used for other corporate purposes nor distributed as dividends. It is true that, should the company become insolvent, this fund (in so far as state required) would be used for reinsurance and lost to the company. But the very nature of the business necessitates such a fund and such possible use thereof. And, all the while, this necessary fund is producing for the company the same income as from its other investments. The fact that the reserve fund cannot be used for corporate purposes nor distributed in dividends is not at all conclusive. From the nature of the business it would not be so used or distributed and no prudent and honest corporate management would ever think of such use or distribution. Therefore, that argument is purely theoretical and has no practical value.

Another consideration is as follows: It is obvious that the object of an insurance company is to make money out of premiums. It is organized and exists for that purpose. Clearly, the greater the volume of business, the greater should be the profit. In fact, most companies must operate at a positive loss until profit from the volume of business overcomes expenses. The greater and faster the business volume increases, the more expense required to produce it and the greater relative amount of "unearned" premiums necessary to protect that volume. If "unearned" premiums are to be excluded from calculation of income and profits, there is the anomalous result of an increasingly prosperous business in *fact* and an increasingly unprosperous business in *theory*. Take an illustration of a single piece of business: The day after a policy is paid for and in force, the amount required to reinsure it would be practically the entire premium paid, since only one day of the insured period has run, and this required amount would be "unearned" premium. It required expense to produce that policy—agent's commission, etc. If "unearned" premium is to be excluded, the company has had a heavy loss on that policy at that time. Yet the company makes its money by getting such policies and going through such experiences as to policies and premiums.

This seems to us to be an unsound theory based upon conditions which do not exist in fact.

On the contrary, premium "paid" represents money actually coming in from the business of underwriting and actually becoming the property of the company and subject to its investment and resulting profit therefrom. We think premium "paid," without interest on "unearned" premiums, is the proper and actual basis for income in rate making under this statute. This disposes of that part of the controversy over the rate bases, which relates to *income*.

There is, as said above, a controversy, also, as to the basis for expenses and losses which shall be used. Defendants contend that losses and expenses "paid" during the test period should be used. The word "paid" requires no definition. Plaintiffs contend that losses and expenses "incurred" during the test period should be used. By losses "incurred" they mean "those which happened during the periods and for which liability became firmly fixed during the period." (Brief p. 14.) The difficulty with this latter method is not in its theory but in its practical application. If by "liability became firmly fixed during the period" is meant merely where the loss occurs during the period, then it would, in practical application, require some estimate of losses not fully adjusted or accepted within such period although such are frequently subject to wide ranges between amounts claimed by insured and those conceded by the insurer and sometimes the liability is denied entirely and often the difference hinges on complicated facts requiring extended presentation and much evidence. This would afford opportunity for important differences as to how such amounts should be determined and by whom determined and require extended investigation to be more than a wild guess and, at very best, would be merely and solely an "estimate" or matter of opinion. However, the expression quoted evidently means something more than the mere occurrence of the loss under the policy within the period. It means that the amount of loss has been "firmly fixed," by judgment in a court within the period or by action of the parties within the period. In practical application, this would entirely eliminate all losses occurring near the end of a period which were not "firmly fixed" within the period; all losses so occurring near the end of the proceeding period and all losses passing into litigation or extended negotiation reaching beyond the particular period of occurrence. This method would exclude all of the above classes from inclusion in *any* period. These classes are not inconsiderable and, obviously, they should be included at some time because they are actually paid by the insurer.

While the losses "paid" method, urged by

the defendants, will not accurately represent the losses occurring within a given period, because it will include payments for some losses occurring prior to the period and will exclude some losses occurring during the period but not "firmly fixed" within the same period, yet there is no reason to think that *ordinary* losses and actual payments thereon will not normally pretty fairly equalize from year to year and, moreover, the payments will be actualities instead of guesses or estimates. This is even truer where the test period extends over a term of consecutive years as here (the statute requiring five years). The *extraordinary* losses (so-called "fire hazard") are taken care of in the rate by an addition thereto for that particular purpose. While neither method is perfect in application, the paid method seems more practical and entirely fair to the companies as it includes *all* losses—a thing which the other method could not do.

As to underwriting expenses and as to payments on account of policy cancellations, the amounts due are almost always subject to definite and immediate statement and might well be subject to either the "incurred" or the "paid" method. Because we doubt if there would be appreciable difference between these two methods, from year to year, and merely for uniformity, we think it would be better to have them follow the method adopted as to losses.

### Summary.

Our conclusion as to proper basis for rate purposes is that it should be based upon underwriting income and upon losses, cancellation payments and underwriting expenses; that such income should consist of *paid* premiums alone without interest from any source; that losses, cancellation payments and underwriting expenses should be taken upon the *paid* method, that, in these cases, it is proper to consider the effect upon expenses (in determining confiscation) of the repealed war tax and, under the evidence now here, it is not proper to consider the so-called excess agency commissions in St. Louis.

### The Evidence.

■ Having attempted to examine and determine all of the contentions which are generally applicable to all of these cases, consideration next is to be given to the particular evidence in each case to determine whether that evidence establishes confiscation as to the particular plaintiff. Examination of the petitions reveals that they are all drawn upon the theory, common with the plaintiffs, that the basis for determining confiscation is the exclusion of "unearned" premiums from income and the treatment of losses and expenses on the "incurred" theory. All of the evidence of facts relating to or bearing upon confiscation is of that character whether in the verified petitions, in affidavits or orally given. We think that basis is unsound. Evidence purely of that character is no guide nor help in determining confiscation in the way which seems to us proper. In short, there is no evidence from which confiscation could be found in any of the cases. The burden of proving confiscation has not been met. Ordinarily, the result from such failure would be denial of temporary injunctive relief. However, there are other considerations bearing upon the matter. The failure of proof here arises from a mistake as to the basis of or line of evidence and not from inability to produce proof along proper lines. The defendants have offered no evidence of facts to refute the claim of confiscation. This is not stated as a criticism, for counsel might rely upon the weakness of plaintiffs' evidence to sustain the burden of proof. It is stated to make clear that neither party has introduced and this court has before it in these hearings no evidence which properly bears upon confiscation in any of these cases. Yet the court knows that there is much, very much, evidence upon this crucial matter. With the bases for such inquiry determined, the parties will produce this evidence—for and against confiscation. It is impossible to anticipate that proof.

The issues in these cases are grave and are seriously urged and of far reaching consequence. If the injunctions be denied until final decree, there might result substantial and irreparable loss to each of these plaintiffs because the recovery of 10 per centum of each premium from each policyholder upon each policy is impractical, if not impossible. The expense thereof is prohibitive when the amount of each recovery is considered. On the other hand, the premium payers can be protected at the same time that the companies are. This can be done by granting the applications for temporary injunction properly conditioned as to bond or deposit in court. This is the method and procedure applicable and approved by the Supreme Court. Ohio Oil Co. v. E. A. Conway, Supervisor, 49 S. Ct. 256, 73 L. Ed. ——, decided March 5, 1929.

### Conclusion.

Allowance of the applications for temporary injunctions (upon conditions protective to premium payers) of all plaintiffs which were not parties to the stipulation.

Denial of applications, without prejudice of renewal upon a showing of repayment under the stipulation, of all plaintiffs which were parties to the stipulation.

## Addendum to Opinion.

At conclusion of reading of the opinion in the above cases, counsel called to the attention of the court the matter of the effective date of the order of the superintendent. The court is indebted to counsel for the suggestion. The members of the court have not overlooked this point in the briefs. However, in reaching the determination that the plaintiffs (parties to the stipulation) should not now be heard and that the plaintiffs (not parties to the stipulation) should be granted injunctions in order to maintain the status quo until the merits could be determined, there was no necessity to dispose of that question and the court purposely omitted to do so.

Later, when the court came to work out the mode of making its determinations effective, that matter was lost sight of inadvertently except that an effective date was placed in the tentative suggestions as to form of order relating to the parties not signing the stipulation.

The suggestion of counsel is well made. It is necessary to state our views upon this matter in order to enable the parties (signing the stipulation) to know the amount of refund necessary and the parties (not so signing) to know the amount of bond necessary.

According to the order, it became effective on November 15, 1922. The statute (section 6283) gives the companies 30 days after a reduction order is made within which time they may apply the reduction to particular classes of insurance to be approved by the superintendent, and, failing so to do, the superintendent shall make such application. It is thus clear that an order of reduction is not fully in force until such designation is made in one of the above ways. Here no such designation has ever been suggested by the companies and the superintendent did not make such until February 1, 1928, when he made the rate applicable to all classes. The contention made by plaintiffs is that the order was not in force until the designation on February 1, 1928. The stipulation expressly provided that any such order should apply to all classes. The stipulation amounted to a designation in advance in so far as the parties thereto were concerned. The companies, which were parties to the stipulation, as well as the superintendent, treated the rates as in effect, under the stipulation, without any such designation. No review could be had under section 6284 until the order was binding. The parties pursued the remedy given by that section. Unless and until the order became effective there was no need for the stipulated bond. Yet it was given when the review proceedings (under section 6284) were initiated in the sum of $500,000 and, as stated in the petition herein, "the terms of said bond to said defendant Hyde, for the use and benefit of all persons, firms and corporations to whom policies of fire, lightning, hail and windstorm insurance, covering property in the state of Missouri, may be issued * * * on and after November 10, 1922, and prior to the entry of a final decree in said cause." Also, as these collections increased, additional bond was given by such plaintiffs in a like amount, prior to February 1, 1928. The only explanation of such conduct is that all parties understood the stipulation to settle the matter of designation of classes. Such plaintiffs cannot now take a directly opposite position. They are estopped to deny that the order was not in effect as to them from the effective date (November 15, 1922) provided in the order itself.

The plaintiffs here which were not parties to the stipulation are in a better position. They can require an absolute compliance with the statute. As to them the order did not become effective until February 1, 1928.